## COTTAGE SAVINGS ASSOCIATION *v.* COMMIS-
## SIONER OF INTERNAL REVENUE

No. 89–1965.   Argued January 15, 1991—Decided April 17, 1991

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 568.

*Dennis L. Manes* argued the cause for petitioner. With him on the briefs was *Scott M. Slovin.*

*Acting Solicitor General Roberts* argued the cause for respondent. With him on the brief were *Assistant Attorney General Peterson, Deputy Solicitor General Wallace, Clifford M. Sloan, Richard Farber,* and *Bruce R. Ellisen.*

JUSTICE MARSHALL delivered the opinion of the Court.

The issue in this case is whether a financial institution realizes tax-deductible losses when it exchanges its interests in one group of residential mortgage loans for another lender's interests in a different group of residential mortgage loans. We hold that such a transaction does give rise to realized losses.

I

Petitioner Cottage Savings Association (Cottage Savings) is a savings and loan association (S & L) formerly regulated by the Federal Home Loan Bank Board (FHLBB).[1] Like many S & L's, Cottage Savings held numerous long-term, low-interest mortgages that declined in value when interest rates surged in the late 1970's. These institutions would have benefited from selling their devalued mortgages in order to realize tax-deductible losses. However, they were deterred from doing so by FHLBB accounting regulations, which required them to record the losses on their books.

---

[1] Congress abolished the FHLBB in 1989. See § 401 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101–73, 103 Stat. 354.

Reporting these losses consistent with the then-effective FHLBB accounting regulations would have placed many S & L's at risk of closure by the FHLBB.

The FHLBB responded to this situation by relaxing its requirements for the reporting of losses. In a regulatory directive known as "Memorandum R–49," dated June 27, 1980, the FHLBB determined that S & L's need not report losses associated with mortgages that are exchanged for "substantially identical" mortgages held by other lenders.[2] The FHLBB's acknowledged purpose for Memorandum R–49 was to facilitate transactions that would generate tax losses but that would not substantially affect the economic position of the transacting S & L's.

This case involves a typical Memorandum R–49 transaction. On December 31, 1980, Cottage Savings sold "90% participation interests" in 252 mortgages to four S & L's. It simultaneously purchased "90% participation interests" in 305 mortgages held by these S & L's.[3] All of the loans in-

---

[2] Memorandum R–49 listed 10 criteria for classifying mortgages as substantially identical.

"The loans involved must:

"1. involve single-family residential mortgages,

"2. be of similar type (e. g., conventionals for conventionals),

"3. have the same stated terms to maturity (e. g., 30 years),

"4. have identical stated interest rates,

"5. have similar seasoning (i. e., remaining terms to maturity),

"6. have aggregate principal amounts within the lesser of 2½% or $100,000 (plus or minus) on both sides of the transaction, with any additional consideration being paid in cash,

"7. be sold without recourse,

"8. have similar fair market values,

"9. have similar loan-to-value ratios at the time of the reciprocal sale, and

"10. have all security properties for both sides of the transaction in the same state." Record, Exh. 72–BT.

[3] By exchanging merely participation interests rather than the loans themselves, each party retained its relationship with the individual obligors. Consequently, each S & L continued to service the loans on which it

volved in the transaction were secured by single-family homes, most in the Cincinnati area. The fair market value of the package of participation interests exchanged by each side was approximately $4.5 million. The face value of the participation interests Cottage Savings relinquished in the transaction was approximately $6.9 million. See 90 T. C. 372, 378–382 (1988).

On its 1980 federal income tax return, Cottage Savings claimed a deduction for $2,447,091, which represented the adjusted difference between the face value of the participation interests that it traded and the fair market value of the participation interests that it received. As permitted by Memorandum R–49, Cottage Savings did not report these losses to the FHLBB. After the Commissioner of Internal Revenue disallowed Cottage Savings' claimed deduction, Cottage Savings sought a redetermination in the Tax Court. The Tax Court held that the deduction was permissible. See 90 T. C. 372 (1988).

On appeal by the Commissioner, the Court of Appeals reversed. 890 F. 2d 848 (CA6 1989). The Court of Appeals agreed with the Tax Court's determination that Cottage Savings had realized its losses through the transaction. See *id.*, at 852. However, the court held that Cottage Savings was not entitled to a deduction because its losses were not "actually" sustained during the 1980 tax year for purposes of 26 U. S. C. § 165(a). See 890 F. 2d, at 855.

Because of the importance of this issue to the S & L industry and the conflict among the Circuits over whether Memorandum R–49 exchanges produce deductible tax losses,[4] we granted certiorari. 498 U. S. 808 (1990). We now reverse.

---

had transferred the participation interests and made monthly payments to the participation-interest holders. See 90 T. C. 372, 381 (1988).

[4] The two other Courts of Appeals that have considered the tax treatment of Memorandum R–49 transactions have found that these transactions do give rise to deductible losses. See *Federal Nat. Mortgage Assn.*

## II

Rather than assessing tax liability on the basis of annual fluctuations in the value of a taxpayer's property, the Internal Revenue Code defers the tax consequences of a gain or loss in property value until the taxpayer "realizes" the gain or loss. The realization requirement is implicit in § 1001(a) of the Code, 26 U. S. C. § 1001(a), which defines "[t]he gain [or loss] from the sale or other disposition of property" as the difference between "the amount realized" from the sale or disposition of the property and its "adjusted basis." As this Court has recognized, the concept of realization is "founded on administrative convenience." *Helvering* v. *Horst*, 311 U. S. 112, 116 (1940). Under an appreciation-based system of taxation, taxpayers and the Commissioner would have to undertake the "cumbersome, abrasive, and unpredictable administrative task" of valuing assets on an annual basis to determine whether the assets had appreciated or depreciated in value. See 1 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts ¶ 5.2, p. 5–16 (2d ed. 1989). In contrast, "[a] change in the form or extent of an investment is easily detected by a taxpayer or an administrative officer." R. Magill, Taxable Income 79 (rev. ed. 1945).

Section 1001(a)'s language provides a straightforward test for realization: to realize a gain or loss in the value of property, the taxpayer must engage in a "sale or other disposition of [the] property." The parties agree that the exchange of participation interests in this case cannot be characterized as a "sale" under § 1001(a); the issue before us is whether the transaction constitutes a "disposition of property." The Commissioner argues that an exchange of property can be treated as a "disposition" under § 1001(a) only if the properties exchanged are materially different. The Commissioner further submits that, because the underlying mortgages

v. *Commissioner*, 283 U. S. App. D. C. 53, 56–58, 896 F. 2d 580, 583–584 (1990); *San Antonio Savings Assn.* v. *Commissioner*, 887 F. 2d 577 (CA5 1989).

were essentially economic substitutes, the participation interests exchanged by Cottage Savings were not materially different from those received from the other S & L's. Cottage Savings, on the other hand, maintains that *any* exchange of property is a "disposition of property" under § 1001(a), regardless of whether the property exchanged is materially different. Alternatively, Cottage Savings contends that the participation interests exchanged were materially different because the underlying loans were secured by different properties.

We must therefore determine whether the realization principle in § 1001(a) incorporates a "material difference" requirement. If it does, we must further decide what that requirement amounts to and how it applies in this case. We consider these questions in turn.

A

Neither the language nor the history of the Code indicates whether and to what extent property exchanged must differ to count as a "disposition of property" under § 1001(a). Nonetheless, we readily agree with the Commissioner that an exchange of property gives rise to a realization event under § 1001(a) only if the properties exchanged are "materially different." The Commissioner himself has by regulation construed § 1001(a) to embody a material difference requirement:

"Except as otherwise provided . . . the gain or loss realized from the conversion of property into cash, *or from the exchange of property for other property differing materially either in kind or in extent*, is treated as income or as loss sustained." Treas. Reg. § 1.1001–1, 26 CFR § 1.1001–1 (1990) (emphasis added).

Because Congress has delegated to the Commissioner the power to promulgate "all needful rules and regulations for the enforcement of [the Internal Revenue Code]," 26 U. S. C. § 7805(a), we must defer to his regulatory interpre-

tations of the Code so long as they are reasonable, see *National Muffler Dealers Assn., Inc.* v. *United States,* 440 U. S. 472, 476–477 (1979).

We conclude that Treasury Regulation § 1.1001–1 *is* a reasonable interpretation of § 1001(a). Congress first employed the language that now comprises § 1001(a) of the Code in § 202(a) of the Revenue Act of 1924, ch. 234, 43 Stat. 253; that language has remained essentially unchanged through various reenactments.[5] And since 1934, the Commissioner has construed the statutory term "disposition of property" to include a "material difference" requirement.[6] As we have recognized, " 'Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reënacted statutes, are deemed to have received congressional approval and have the effect of law.' " *United States* v. *Correll,* 389 U. S. 299, 305–306 (1967), quoting *Helvering* v. *Winmill,* 305 U. S. 79, 83 (1938).

Treasury Regulation § 1.001–1 is also consistent with our landmark precedents on realization. In a series of early decisions involving the tax effects of property exchanges, this Court made clear that a taxpayer realizes taxable income

---

[5] Section 202(a) of the 1924 Act provided:

"Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in subdivision (a) or (b) of section 204, and the loss shall be the excess of such basis over the amount realized."

The essence of this provision was reenacted in § 111(a) of Revenue Act of 1934, ch. 277, 48 Stat. 703; and then in § 111(a) of the Internal Revenue Code of 1939, ch. 1, 53 Stat. 37; and finally in § 1001(a) of the Internal Revenue Code of 1954, Pub. L. 591, 68A Stat. 295.

[6] What is now Treas. Reg. § 1.1001–1 originated as Treas. Reg. 86, Art. 111–1, which was promulgated pursuant to the Revenue Act of 1934. That regulation provided:

"Except as otherwise provided, the Act regards as income or as loss sustained, the gain or loss realized from the conversion of property into cash, *or from the exchange of property for other property differing materially either in kind or in extent*" (emphasis added).

only if the properties exchanged are "materially" or "essentially" different. See *United States* v. *Phellis*, 257 U. S. 156, 173 (1921); *Weiss* v. *Stearn*, 265 U. S. 242, 253–254 (1924); *Marr* v. *United States*, 268 U. S. 536, 540–542 (1925); see also *Eisner* v. *Macomber*, 252 U. S. 189, 207–212 (1920) (recognizing realization requirement). Because these decisions were part of the "contemporary legal context" in which Congress enacted § 202(a) of the 1924 Act, see *Cannon* v. *University of Chicago*, 441 U. S. 677, 698–699 (1979), and because Congress has left undisturbed through subsequent reenactments of the Code the principles of realization established in these cases, we may presume that Congress intended to codify these principles in § 1001(a), see *Pierce* v. *Underwood*, 487 U. S. 552, 567 (1988); *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978). The Commissioner's construction of the statutory language to incorporate these principles certainly was reasonable.

B

Precisely what constitutes a "material difference" for purposes of § 1001(a) of the Code is a more complicated question. The Commissioner argues that properties are "materially different" only if they differ in economic substance. To determine whether the participation interests exchanged in this case were "materially different" in this sense, the Commissioner argues, we should look to the attitudes of the parties, the evaluation of the interests by the secondary mortgage market, and the views of the FHLBB. We conclude that § 1001(a) embodies a much less demanding and less complex test.

Unlike the question *whether* § 1001(a) contains a material difference requirement, the question of *what constitutes* a material difference is not one on which we can defer to the Commissioner. For the Commissioner has not issued an authoritative, prelitigation interpretation of what property

exchanges satisfy this requirement.[7]  Thus, to give meaning to the material difference test, we must look to the case law from which the test derives and which we believe Congress intended to codify in enacting and reenacting the language that now comprises § 1001(a).  See *Lorillard* v. *Pons, supra,* at 580–581.

We start with the classic treatment of realization in *Eisner* v. *Macomber, supra.*  In *Macomber,* a taxpayer who owned 2,200 shares of stock in a company received another 1,100 shares from the company as part of a pro rata stock dividend meant to reflect the company's growth in value.  At issue was whether the stock dividend constituted taxable income. We held that it did not, because no gain was realized.  See *id.,* at 207–212.  We reasoned that the stock dividend merely reflected the increased worth of the taxpayer's stock, see *id.,* at 211–212, and that a taxpayer realizes increased worth of property only by receiving "something of exchangeable value *proceeding from* the property," see *id.,* at 207.

In three subsequent decisions — *United States* v. *Phellis, supra; Weiss* v. *Stearn, supra;* and *Marr* v. *United States, supra* — we refined *Macomber*'s conception of realization in the context of property exchanges.  In each case, the taxpayer owned stock that had appreciated in value since its ac-

---

[7] In its brief in *United States* v. *Centennial Savings Bank FSB,* No. 89–1926, the United States cites two Revenue Rulings that support the position that mortgages exchanged through reciprocal mortgage sales are not materially different.  See Brief for United States 25, n. 21 (citing Rev. Rul. 85–125, 1985–2 Cum. Bull. 180; Rev. Rul. 81–204, 1981–2 Cum. Bull. 157).  Perhaps because the two Revenue Rulings postdate the reciprocal mortgage exchange transaction at issue here and do not purport to define the "differ materially" language in Treasury Regulation § 1.1001–1, the Commissioner has not argued that the position taken in these rulings is entitled to deference.  Compare, *e. g., National Muffler Dealers Assn., Inc.* v. *United States,* 440 U. S. 472, 483–484, and nn. 16–19 (1979) (deferring to position reflected in longstanding series of Revenue Rulings consistently adhering to same position in a variety of fact patterns).  See generally *Udall* v. *Tallman,* 380 U. S. 1, 16–17 (1965) (agency's reasonable interpretation of its own regulations is entitled to deference).

quisition. And in each case, the corporation in which the taxpayer held stock had reorganized into a new corporation, with the new corporation assuming the business of the old corporation. While the corporations in *Phellis* and *Marr* both changed from New Jersey to Delaware corporations, the original and successor corporations in *Weiss* both were incorporated in Ohio. In each case, following the reorganization, the stockholders of the old corporation received shares in the new corporation equal to their proportional interest in the old corporation.

The question in these cases was whether the taxpayers realized the accumulated gain in their shares in the old corporation when they received in return for those shares stock representing an equivalent proportional interest in the new corporations. In *Phellis* and *Marr*, we held that the transactions were realization events. We reasoned that because a company incorporated in one State has "different rights and powers" from one incorporated in a different State, the taxpayers in *Phellis* and *Marr* acquired through the transactions property that was "materially different" from what they previously had. *United States* v. *Phellis*, 257 U. S., at 169–173; see *Marr* v. *United States*, *supra*, at 540–542 (using phrase "essentially different"). In contrast, we held that no realization occurred in *Weiss*. By exchanging stock in the predecessor corporation for stock in the newly reorganized corporation, the taxpayer did not receive "a thing really different from what he theretofore had." *Weiss* v. *Stearn*, *supra*, at 254. As we explained in *Marr*, our determination that the reorganized company in *Weiss* was not "really different" from its predecessor turned on the fact that both companies were incorporated in the same State. See *Marr* v. *United States*, *supra*, at 540–542 (outlining distinction between these cases).

Obviously, the distinction in *Phellis* and *Marr* that made the stock in the successor corporations materially different from the stock in the predecessors was minimal. Taken to-

gether, *Phellis*, *Marr*, and *Weiss* stand for the principle that properties are "different" in the sense that is "material" to the Internal Revenue Code so long as their respective possessors enjoy legal entitlements that are different in kind or extent. Thus, separate groups of stock are not materially different if they confer "the same proportional interest of the same character in the same corporation." *Marr* v. *United States*, 268 U. S., at 540. However, they *are* materially different if they are issued by different corporations, *id.*, at 541; *United States* v. *Phellis*, *supra*, at 173, or if they confer "differen[t] rights and powers" in the same corporation, *Marr* v. *United States*, *supra*, at 541. No more demanding a standard than this is necessary in order to satisfy the administrative purposes underlying the realization requirement in § 1001(a). See *Helvering* v. *Horst*, 311 U. S., at 116. For, as long as the property entitlements are not identical, their exchange will allow both the Commissioner and the transacting taxpayer easily to fix the appreciated or depreciated values of the property relative to their tax bases.

In contrast, we find no support for the Commissioner's "economic substitute" conception of material difference. According to the Commissioner, differences between properties are material for purposes of the Code only when it can be said that the parties, the relevant market (in this case the secondary mortgage market), and the relevant regulatory body (in this case the FHLBB) would consider them material. Nothing in *Phellis*, *Weiss*, and *Marr* suggests that exchanges of properties must satisfy such a subjective test to trigger realization of a gain or loss.

Moreover, the complexity of the Commissioner's approach ill serves the goal of administrative convenience that underlies the realization requirement. In order to apply the Commissioner's test in a principled fashion, the Commissioner and the taxpayer must identify the relevant market, establish whether there is a regulatory agency whose views should be taken into account, and then assess how the relevant market

participants and the agency would view the transaction. The Commissioner's failure to explain how these inquiries should be conducted further calls into question the workability of his test.

Finally, the Commissioner's test is incompatible with the structure of the Code. Section 1001(c) of Title 26 provides that a gain or loss realized under § 1001(a) "shall be recognized" unless one of the Code's nonrecognition provisions applies. One such nonrecognition provision withholds recognition of a gain or loss realized from an exchange of properties that would appear to be economic substitutes under the Commissioner's material difference test. This provision, commonly known as the "like kind" exception, withholds recognition of a gain or loss realized "on the exchange of property held for productive use in a trade or business or for investment . . . for property of like kind which is to be held either for productive use in a trade or business or for investment." 26 U. S. C. § 1031(a)(1). If Congress had expected that exchanges of similar properties would *not* count as realization events under § 1001(a), it would have had no reason to bar recognition of a gain or loss realized from these transactions.

## C

Under our interpretation of § 1001(a), an exchange of property gives rise to a realization event so long as the exchanged properties are "materially different"—that is, so long as they embody legally distinct entitlements. Cottage Savings' transactions at issue here easily satisfy this test. Because the participation interests exchanged by Cottage Savings and the other S & L's derived from loans that were made to different obligors and secured by different homes, the exchanged interests did embody legally distinct entitlements. Consequently, we conclude that Cottage Savings realized its losses at the point of the exchange.

The Commissioner contends that it is anomalous to treat mortgages deemed to be "substantially identical" by the

FHLBB as "materially different." The anomaly, however, is merely semantic; mortgages can be substantially identical for Memorandum R–49 purposes and still exhibit "differences" that are "material" for purposes of the Internal Revenue Code. Because Cottage Savings received entitlements different from those it gave up, the exchange put both Cottage Savings and the Commissioner in a position to determine the change in the value of Cottage Savings' mortgages relative to their tax bases. Thus, there is no reason not to treat the exchange of these interests as a realization event, regardless of the status of the mortgages under the criteria of Memorandum R–49.

## III

Although the Court of Appeals found that Cottage Savings' losses were realized, it disallowed them on the ground that they were not sustained under § 165(a) of the Code, 26 U. S. C. § 165(a). Section 165(a) states that a deduction shall be allowed for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Under the Commissioner's interpretation of § 165(a),

> "To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and § 1.165–11, relating to disaster losses, actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." Treas. Reg. § 1.165–1(b), 26 CFR § 1.165–1(b) (1990).

The Commissioner offers a minimal defense of the Court of Appeals' conclusion. The Commissioner contends that the losses were not sustained because they lacked "economic substance," by which the Commissioner seems to mean that the losses were not bona fide. We say "seems" because the Commissioner states the position in one sentence in a foot-

note in his brief without offering further explanation. See Brief for Respondent 34–35, n. 39. The only authority the Commissioner cites for this argument is *Higgins* v. *Smith*, 308 U. S. 473 (1939). See Brief for United States in No. 89–1926, p. 16, n. 11.

In *Higgins*, we held that a taxpayer did not sustain a loss by selling securities below cost to a corporation in which he was the sole shareholder. We found that the losses were not bona fide because the transaction was not conducted at arm's length and because the taxpayer retained the benefit of the securities through his wholly owned corporation. See *Higgins* v. *Smith*, *supra*, at 475–476. Because there is no contention that the transactions in this case were not conducted at arm's length, or that Cottage Savings retained *de facto* ownership of the participation interests it traded to the four reciprocating S & L's, *Higgins* is inapposite. In view of the Commissioner's failure to advance any other arguments in support of the Court of Appeals' ruling with respect to § 165(a), we conclude that, for purposes of this case, Cottage Savings sustained its losses within the meaning of § 165(a).

## IV

For the reasons set forth above, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE WHITE joins, concurring in part and dissenting in part in No. 89–1926, *post*, p. 573, and dissenting in No. 89–1965.

I agree that the early withdrawal penalties collected by Centennial Savings Bank FSB do not constitute "income by reason of the discharge . . . of indebtedness of the taxpayer," within the meaning of 26 U. S. C. § 108(a)(1) (1982 ed.), and that the penalty amounts are not excludable from Centennial's gross income. I therefore join Part III of the Court's opinion in No. 89–1926.

I dissent, however, from the Court's conclusions in these two cases that Centennial and Cottage Savings Association realized deductible losses for income tax purposes when each exchanged partial interests in one group of residential mortgage loans for partial interests in another like group of residential mortgage loans. I regard these losses as not recognizable for income tax purposes because the mortgage packages so exchanged were substantially identical and were not materially different.

The exchanges, as the Court acknowledges, were occasioned by Memorandum R–49, Record, Exh. 72–BT, issued by the Federal Home Loan Bank Board (FHLBB) on June 27, 1980, and by that Memorandum's relaxation of theretofore-existing accounting regulations and requirements, a relaxation effected to avoid placement of "many S & L's at risk of closure by the FHLBB" without substantially affecting the "economic position of the transacting S & L's." *Ante,* at 557. But the Memorandum, the Court notes, also had as a purpose the "facilit[ation of] transactions that would generate tax losses." *Ibid.* I find it somewhat surprising that an agency not responsible for tax matters would presume to dictate what is or is not a deductible loss for federal income tax purposes. I had thought that that was something within the exclusive province of the Internal Revenue Service, subject to administrative and judicial review. Certainly, the FHLBB's opinion in this respect is entitled to no deference whatsoever. See *United States* v. *Stewart,* 311 U. S. 60, 70 (1940); *Graff* v. *Commissioner,* 673 F. 2d 784, 786 (CA5 1982) (concurring opinion). The Commissioner, of course, took the opposing position. See Rev. Rul. 85–125, 1985–2 Cum. Bull. 180; Rev. Rul. 81–204, 1981–2 Cum. Bull. 157.

It long has been established that gain or loss in the value of property is taken into account for income tax purposes only if and when the gain or loss is "realized," that is, when it is tied to a realization event, such as the sale, exchange, or other disposition of the property. Mere variation in value—

the routine ups and downs of the marketplace—do not in themselves have income tax consequences. This is fundamental in income tax law.

In applying the realization requirement to an exchange, the properties involved must be materially different in kind or in extent. Treas. Reg. § 1.1001–1(a), 26 CFR § 1.1001–1(a) (1990). This has been the rule recognized administratively at least since 1935, see Treas. Regs. 86, Art. 111–1, issued under the Revenue Act of 1934, and by judicial decision. See, *e. g., Mutual Loan & Savings Co.* v. *Commissioner*, 184 F. 2d 161 (CA5 1950). See also *Marr* v. *United States*, 268 U. S. 536, 541 (1925); *Weiss* v. *Stearn*, 265 U. S. 242, 254 (1924); *United States* v. *Phellis*, 257 U. S. 156 (1921). This makes economic as well as tax sense, for the parties obviously regard the exchanged properties as having equivalent values. In tax law, we should remember, substance rather than form determines tax consequences. *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, 334 (1945); *Gregory* v. *Helvering*, 293 U. S. 465, 469–470 (1935); *Shoenberg* v. *Commissioner*, 77 F. 2d 446, 449 (CA8), cert. denied, 296 U. S. 586 (1935). Thus, the resolution of the exchange issue in these cases turns on the "materially different" concept. The Court recognizes as much. *Ante*, at 559–560.

That the mortgage participation partial interests exchanged in these cases were "different" is not in dispute. The materiality prong is the focus. A material difference is one that has the capacity to influence a decision. See, *e. g., Kungys* v. *United States*, 485 U. S. 759, 770–771 (1988); *Basic Inc.* v. *Levinson*, 485 U. S. 224, 240 (1988); *TSC Industries, Inc.* v. *Northway, Inc.*, 426 U. S. 438, 449 (1976).

The application of this standard leads, it seems to me, to only one answer—that the mortgage participation partial interests released were not materially different from the mortgage participation partial interests received. Memorandum R–49, as the Court notes, *ante*, at 557, n. 2, lists 10 factors that, when satisfied, as they were here, serve to classify the

interests as "substantially identical." These factors assure practical identity; surely, they then also assure that any difference cannot be of consequence. Indeed, nonmateriality is the full purpose of the Memorandum's criteria. The "proof of the pudding" is in the fact of its complete accounting acceptability to the FHLBB. Indeed, as has been noted, it is difficult to reconcile substantial identity for financial accounting purposes with a material difference for tax accounting purposes. See *First Federal Savings & Loan Assn. of Temple* v. *United States*, 694 F. Supp. 230, 245 (WD Tex. 1988), aff'd, 887 F. 2d 593 (CA5 1989), cert. pending No. 89–1927. Common sense so dictates.

This should suffice and be the end of the analysis. Other facts, however, solidify the conclusion: The retention by the transferor of 10% interests, enabling it to keep on servicing its loans; the transferor's continuing to collect the payments due from the borrowers so that, so far as the latter were concerned, it was business as usual, exactly as it had been; the obvious lack of concern or dependence of the transferor with the "differences" upon which the Court relies (as transferees, the taxpayers made no credit checks and no appraisals of collateral, see 890 F. 2d 848, 849 (CA6 1989)); 90 T. C. 372, 382 (1988); 682 F. Supp. 1389, 1392 (ND Tex. 1988); the selection of the loans by a computer programmed to match mortgages in accordance with the Memorandum R–49 criteria; the absence of even the names of the borrowers in the closing schedules attached to the agreements; Centennial's receipt of loan files only six years after its exchange, *id.*, at 1392, n. 5; the restriction of the interests exchanged to the same State; the identity of the respective face and fair market values; and the application by the parties of common discount factors to each side of the transaction—all reveal that any differences that might exist made no difference whatsoever and were not material. This demonstrates the real nature of the transactions, including nonmateriality of the claimed differences.

We should be dealing here with realities and not with superficial distinctions. As has been said many times, and as noted above, in income tax law we are to be concerned with substance and not with mere form. When we stray from that principle, the new precedent is likely to be a precarious beacon for the future.

I respectfully dissent on this issue.