**REBECCA K. CROWN INCOME CHARITABLE FUND, Arie S. Crown, et al., Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 92–3957.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1993.

Decided Oct. 29, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 9, 1993.[*]

[*] Hon. Richard D. Cudahy took no part in the consideration of the rehearing en banc.

**572**

Alan L. Reinstein, Byron S. Miller, Geoffrey F. Grossman, Darryl P. Jacobs, Steven L. Baron, Chicago, IL, for petitioners-appellants.

Richard Farber, Gary R. Allen, Edward T. Perelmuter, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellee.

Before POSNER, Chief Judge, MANION, Circuit Judge, and FOREMAN, Senior District Judge.**

** Hon. James L. Foreman of the Southern District of Illinois, sitting by designation.

POSNER, Chief Judge.

In 1983, senior members of a very wealthy Chicago family, the Crowns, created what is called a "charitable lead trust" and took a $15 million deduction for charity on their gift-tax returns. The trustees are younger members of the family. In a charitable lead trust, which comes in two varieties, grantor and nongrantor, the latter being the type involved in this case, the trust instrument requires the trust to pay a fixed sum of money per year to qualified charities for a specified number of years, and the discounted present value of that stream of promised payments is the amount allowable as a gift-tax deduction for a gift to charity. 26 U.S.C. §§ 2522(a)(2), (c)(2)(B). The present value of the stream is, if correctly discounted, a fair estimate of the value of the charitable gift. Whatever is left over after charities have received the committed amount goes to the trust's remaindermen, who in this case are still-younger Crowns—the children and grandchildren (in some cases as yet unborn) of the trustee Crowns, who are of the generation between the trust's creator-donors and the remaindermen. The trust instrument directs the trustees to donate to charities $975,000 a year for 45 years, and the present value of such a gift, discounted at 6 percent (the rate the donors were required to use, Treas.Reg. §§ 25.2522(c)–3(d)(2)(iv), 25.2512–9(a)(2), 25.2512–9 (tab. B)), is slightly more than $15 million. The trust was funded with a $15 million contribution from the donors, which was used to buy securities to generate income to defray the expense of the charitable donations that the trust is required to make.

The trust instrument provides—and here we approach the heart of this case—that only if "as a matter of law" the trustees can prepay (accelerate, commute) amounts due the charities "without adversely affecting the maximum charitable deduction" are they authorized to do so. In each of the taxable years 1984 through 1986, the trustees deducted on the trust's income tax return more than $975,000 in gifts to charities (in 1986, for example, they deducted $1.9 million). The trust's investments had earned more

than $975,000 in each of those years, and any amount of income that the trust failed to give to charity would be taxable income of the trust. The charitable deduction from income tax for trusts, unlike that for individuals, has no cap. 26 U.S.C. § 642(c)(1). Nevertheless the Internal Revenue Service limited the trust's charitable deduction to $975,000 per year, assessing income tax on the amount above that which the trust had deducted for charitable gifts. The Tax Court upheld the deficiency. 98 T.C. 327 (1992). Its decision has drawn comment, Conrad Teitell, "Questions Surround Prepayment Clauses of Charitable Trusts," *Trusts & Estates,* July 1992, p. 56, but we have not been able to discover either how common prepayment clauses in charitable lead trusts are in general or how common the particular form of that clause in the Crowns' charitable lead trust is.

 The charitable gift-tax deduction is available only to the extent that the trust's gifts to charity are "pursuant to the terms of the governing instrument." 26 U.S.C. § 642(c)(1); *John Allan Love Charitable Foundation v. United States,* 710 F.2d 1316, 1319 (8th Cir.1983); *Ernest & Mary Hayward Weir Foundation v. United States,* 508 F.2d 894 (2d Cir.1974) (per curiam). Whether the trustees were authorized to prepay in whole or part future installments of the $975,000 committed to be paid each year to charities depends on whether prepayment would "as a matter of law" not adversely affect the $15 million gift-tax deduction taken by the donors. (We assume that this is the "charitable deduction" to which the prepayment clause refers; later we shall examine that assumption critically.) The trustees do not argue that they can take a charitable deduction from the trust's taxable income for excess payments that are not prepayments. If they did that they would be diverting to charity money that the trust instrument reserves to the remaindermen, and thus would again be failing to honor the terms of the trust instrument.

To decide whether prepayment would have jeopardized the donors' gift-tax deduction requires consideration of the potential for tax avoidance created by a charitable lead trust and the possible response of the Internal Revenue Service to that potential. Before 1969, when the charitable lead trust entered the Internal Revenue Code, see Eugene J. Callahan, "Charitable 'Lead' Trusts—the Forgotten Member of the Trilogy," 11 *U. Miami Institute on Estate Planning* ¶ 500 (1977), imaginative tax lawyers played the following game: create a trust in which the income goes to charity and the remainder to the donor's descendants; compute the charitable gift-tax deduction on assumptions favorable to the income beneficiary, that is, the charities; in the administration of the trust jigger the allocation of the trust's receipts as between income and principal to favor principal. In effect, receipts counted as income to charity in the computation of the gift-tax deduction will go to the remaindermen, and the donor will have effected a tax-free transfer to his descendants. See *Tax Reform Studies and Proposals U.S. Treasury Department,* pt. 2, pp. 183, 190 (Joint Publication of H.R. Comm. on Ways and Means and S. Comm. on Finance, 91st Cong., 1st Sess., Feb. 5, 1969). Congress caught on in 1969 and provided that to qualify for the gift-tax deduction a charitable income trust would be required to take a new form, that of a charitable lead trust, defined as a trust in which the governing instrument *guarantees* a specified annual income to charity. 26 U.S.C. § 2522(c)(2)(B); Treas.Reg. § 25.2522(c)–3(c)(2)(vi); H.R.Rep. No. 413, 91st Cong., 1st Sess., pt. 1, at p. 61 (1969). The charitable deduction from gift tax is limited to the present value of that guaranteed stream of income.

Prepayment of the "guaranteed" annual payments might be a method of defeating the legislative objective. There are two arguable abuses, though only the second strikes us as real. The first depends on the fact that, the higher the discount rate used for commutation, the faster the commitment to charity can be liquidated by prepayment, accelerating the transfer of the remainder to the remaindermen. Suppose (ignoring the prepayments actually made in this case) that in the fifth year of the Crown charitable lead trust the principal was still $15 million—the guaranteed payments to charity having been just balanced by the income from the securities constituting the principal—and the trust-

ees decided, let us say correctly, that a fair discount rate, based on current long-term interest rates, at which to commute future to present payments was 10 percent. Then with a distribution to charity that year of less than $10 million, the trust would have commuted its entire future obligations to charity and could pay the remaining $5 million in principal to the remaindermen—to whom the donors would thus have succeeded in transferring $5 million (less of course in present-value terms, since it would have taken five years to complete the transfer) without incurring any gift-tax obligation. This is not an extreme example, because the 6 percent discount rate that the donors were permitted to use when they set up the charitable lead trust was well below market rates.

We are not sure that the situation we have described involves tax abuse. The gift to the remaindermen is accelerated, that is true, but the issue is the gift-tax deduction and since in our example the charities that had received the prepayments could turn around and purchase guaranteed annuities computed on the basis of the current long-term interest rate, they should be able to earn their $975,000 a year. Commutation would not have short-changed the charities and required an adjustment in the gift-tax deduction.

The example assumes that the discount rate used in commutation is equal to the appropriate current market rate of interest. This is by no means clear. The Crowns' charitable lead trust has never disclosed the discount rate at which it is commuting future payments—as we shall see, it has never acknowledged that it has as yet done any commuting. The trust instrument is silent on the discount rate to be used for commuting, as are the statute and the regulation, neither of which so much as mentions commutation—an omission hardly helpful to the trust, as we shall also see. One possibility is that future payments must be commuted at the same rate used to calculate the value of the charitable gift in the first place—the Treasury Regulation table rate of 6 percent applicable to the Crowns' trust. Callahan, *supra*, ¶ 503.8. In that event, however, the second potential abuse comes into view: the trustees, to the extent that the interests of the

remaindermen are foremost in their minds, would have an incentive to commute future charitable payments whenever the market interest rate fell below the table rate. The lower the current interest rate, the higher the fraction of the income of the trust's investments that must be used to generate the $975,000 promised charities each year. Indeed, if interest rates plunged deep enough, the trustees might have to dip into principal to make good the annual guarantee, and there might in the end be nothing left for the remaindermen. But if, say, all the future payments are commuted at once, so that the trust ceases to have any obligations to charity, and the charities that receive these closing payments turn around and buy guaranteed annuities with them, the annual yield from those annuities will be less than $975,000 if, as we are hypothesizing, interest rates have fallen below 6 percent. Such a result, which would in effect shift the risk of changes in interest rates from the remaindermen to charity even though the latter was to have a "guaranteed" income, would be in great tension with the regulation governing charitable lead trusts. The trust must create a "guaranteed annuity interest," defined as "an irrevocable right pursuant to the instrument of transfer to receive a guaranteed annuity," defined in turn as "an arrangement under which *a determinable amount is paid periodically,* but not less often than annually, for a specified term." Treas.Reg. § 25.2522(c)–3(c)(2)(vi) (emphasis added).

We do not suggest that either form of abuse that we have described is at work in this case, and, to repeat, it is far from clear that the first *is* an abuse. Interest rates in the years in question were higher rather than lower than 6 percent, and so far as appears the trustees' desire to prepay at an as yet unspecified discount rate was motivated solely by a desire to minimize the income tax on the income of the trust, a permissible objective. If, moreover, current interest rates were used both for calculating the value of the original gift to charity (as the Internal Revenue Service has been required to do since 1989, 26 U.S.C. § 7520) and for commuting, commutation would change only the form and not the value of the gift. Indeed, so far as the second and possibly only abuse

is concerned, all that matters is that commutation be made at the appropriate current interest rate, since the lower that rate, the greater will be the present value of the charitable entitlement that is being cashed out. If interest rates have fallen, the entitlement will be cashed out at a higher amount, enabling the charitable donees to invest the cash and earn their $975,000 a year at the lower interest rates.

But with the commutation discount rate unsettled during the years in question (and perhaps today), the possibility that commutation might be used abusively cannot be considered negligible. So it is not surprising that the Internal Revenue Service refused then to concede (it still refuses to concede) that commutation was *ever* permissible for a charitable lead trust, leading at least one tax lawyer to express concern that the mere inclusion of a commutation clause in the trust instrument might forfeit the donors' charitable gift-tax deduction. Stephen M. Chiles, "Nonqualified Charitable Lead and Remainder Trusts: Planning Considerations," 66 *Taxes* 777, 778 (1988). That the Service might deem it impermissible must have been in the minds of the lawyers who drafted the trust instrument—why else does it forbid commutation if commutation would jeopardize the charitable deduction? The trustees' argument that the reference is to the charitable deduction from *income* tax makes little sense. It would make the permissibility of making prepayments depend on the permissibility of deducting them, and the permissibility of deducting them depend on the permissibility of making them. And since there is no limit on the amount of charitable giving that a trust can deduct for income tax purposes, there was no reason for the draftsmen to be concerned for income-tax reasons with the amount by which the trust's annual gifts to charity might be swollen by prepayment. The only menace from the standpoint of avoiding unnecessary payment of taxes was that commutation might knock out the charitable lead trust and with it the donors' $15 million charitable deduction from gift tax.

The menace was not so slight as to permit the conclusion that "as a matter of law" prepayment would not adversely affect the deduction. There were no legal rulings on the question—there still aren't—and the trustees were hardly likely to bet the settlors' $15 million deduction against winning a lawsuit with the IRS over the permissibility of commutation. There was sufficient legal uncertainty to forbid the trustees, under the terms of the trust instrument, to commute—which may be why in this very litigation the trustees stipulated that they had *not* commuted any of their future charitable obligations, that is, had not determined the dollar amount by which those obligations had been offset by the excess payments. (That would depend on the commutation discount rate, which remains up in the air.) Their failure actually to commute was the ground—denounced by the appellants as hypertechnical and as waived to boot—on which the Tax Court ruled in favor of the government. We do not place our decision on that ground.

The trustees explain the stipulation as having been made in order to facilitate settlement—they were willing to let the IRS pick the discount rate, and that would determine how much their excess payments to charity had commuted their future obligations under the trust. A more plausible motive to assign to the stipulation is that, were the IRS to take the position that commutation destroys the gift-tax deduction, the trustees could argue that while they had made payments to charity in excess of the guaranteed amount they had not *commuted* any future payments—that is, they had not decided to pay the charities *less* than $975,000 in any future year. They presumably can pay more than $975,000 in a particular year, provided they do not disable themselves from continuing to pay at least $975,000 every subsequent year, without jeopardizing the gift-tax deduction; the only risk would be having to pay income tax on the excess. They could not be thought to be short-changing the charities for the sake of the remaindermen if they paid the former *more* than the trust instrument entitled them to. They would by doing this be short-changing the remaindermen, in violation of the trust instrument, but this would affect only income-tax liability, not gift-tax liability. In short they want to argue commutation in this case to beat income tax by establishing that the excess payments to

charity were authorized by the trust instrument, while reserving the right to renounce commutation should that renunciation prove necessary to preserve the donors' gift-tax deduction. That reservation of rights is further evidence of the trustees' fear that the terms of the trust instrument forbade prepayment.

Although we have assumed that if commutation is impermissible the donors' gift-tax deduction fails, it is not altogether clear how this assumption is to be squared with the three-year statute of limitations for underpayment of gift tax. 26 U.S.C. § 6501. If actions taken by the trustees more than three years after the deduction (short of fraud) do not affect the deduction, it becomes all the more understandable why the Internal Revenue Service should take the position that the reservation of a discretionary power, such as commutation, that the trustees might exercise to reduce the value of the charitable gift years after the deduction had been taken would void the deduction at the outset.

Against all this it can be argued that even if the permissibility of commutation by a charitable lead trust was uncertain when the excess payments were made, if we dispel the uncertainty by ruling that it is permissible this will show that "as a matter of law" commutation did not jeopardize the gift-tax deduction taken by the creators of the trust and therefore did not violate the trust instrument. But we do not think that the trust instrument, properly read, authorized the trustees to gamble on a favorable resolution of the commutation issue. The stakes to the settlors were too great. We read "as a matter of law" as requiring the trustees to obtain, *before* commuting, either a private letter ruling from the Internal Revenue Service or a judicial ruling at the appellate level establishing the propriety of commutation by a charitable lead trust to a reasonable certainty—unless there is no room for doubt. If the law were as one-sided as the trustees contend, they would not require formal clearance from the Service or the judiciary. But it is not one-sided. Even today, the propriety of commutation must be considered uncertain. In so technical an area of tax law, and with due regard for the judicial defer-

ence to which Treasury Regulations are entitled, *Cottage Savings Ass'n v. Commissioner*, 499 U.S. 554, 560, 111 S.Ct. 1503, 1508, 113 L.Ed.2d 589 (1991), we generalist judges should be loath to lay down the law on the question without the Treasury's view, which has not yet crystallized. If we thought the Internal Revenue Service was being coy just to collect a few hundred thousand dollars from the Crowns' charitable lead trust, we might lose our diffidence; but that is improbable and not argued.

Yet the trust could not have obtained a private letter ruling, because in 1982 the Internal Revenue Service announced that it would not issue private letter rulings concerning the propriety of commutation by charitable lead trusts; it wanted to study the issue. And a taxpayer cannot bring a declaratory-judgment action to establish his tax liability. 28 U.S.C. § 2201; Michael I. Saltzman, *IRS Practice and Procedure* ¶ 1.05[5] (2d ed. 1991). But when the trust was set up in 1983, its draftsmen doubtless expected the IRS to move off the dime eventually, and when and if it did give a green light to commutation the trustees would be authorized by the trust instrument to commute. Until that happened or some equivalent assurance was received, they were bound by the instrument to refrain from gambling on the permissibility of commutation. A mistake could conceivably cost the donors millions. The trustees have a legitimate gripe about the Treasury's delay in resolving the issue of permissibility. But that delay does not entitle them to disregard the terms of the trust instrument.

We acknowledge that our interpretation of that instrument as tying the trustees' hands until the legal clouds disperse produces a harsh result in this case. Because interest rates exceeded the table rate when the excess payments were made, commutation at that rate (and the trustees would consent to commutation at that rate) would make the charities unequivocally better off, at least if they used the excess payments to buy guaranteed annuities, for interest rates have since fallen considerably. The ground for refusing to permit the trust to deduct these payments on its income tax returns is not that it is

engaged in a tax dodge but that the trust instrument forbade it to commute until and unless it became clear that a commutation clause does not disqualify the settlor of a charitable lead trust from taking a charitable gift-tax deduction. That is not yet as clear as it needs to be in order to free the trustees' hands.

The appellants' other arguments are either academic in light of our analysis or too insubstantial to require discussion. The judgment of the Tax Court is

AFFIRMED.