T.C. Memo. 1999-291


UNITED STATES TAX COURT


OAK HARBOR FREIGHT LINES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20989-97.                    Filed September 1, 1999.


Scott A. Schumacher and Darrell D. Hallett, for petitioner.

Julie L. Payne, for respondent.


MEMORANDUM OPINION


PARR, Judge:  Respondent determined a deficiency of $177,428 in petitioner's Federal income tax for 1994.  The issue for decision is whether petitioner sustained a $520,677 loss during 1994, as petitioner asserts, or during 1995, as respondent contends, from the cancellation of various intrastate operating authorities.  We hold petitioner sustained the loss during 1994.

Background

This case was submitted fully stipulated under Rule 122.[1] The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner's principal place of business and mailing address were at Auburn, Washington, at the time the petition in this case was filed.

Petitioner is a motor carrier incorporated in the State of Washington and is engaged in the intrastate transportation of goods throughout the Western United States.

In August 1994, Congress enacted the Federal Aviation Administration Authorization Act of 1994 (FAAAA), Pub. L. 103-305, sec. 601, 108 Stat. 1569, 1606 (currently codified as 49 U.S.C. 11501(h)), which became effective on January 1, 1995. At the time of enactment, 41 jurisdictions regulated, in varying degrees, intrastate prices, routes, and services of motor carriers. Finding that the regulation of intrastate transportation of property by the States imposed an unreasonable burden on interstate commerce, impeded the free flow of trade, traffic, and transportation of interstate commerce, and placed an unreasonable cost on the American consumers, Congress acted to

_____

[1]All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the taxable year at issue, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar.

preempt the States' economic regulation of motor carriers. The FAAAA amended 49 U.S.C. sec. 11501 by adding subsection (h), which provided generally that a State may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier or any private motor carrier with respect to the transportation of property.

Before the FAAAA, motor carriers engaged in the transportation of goods within the States of Washington and Oregon were required by each State to possess an operating authority for each route traveled within that State. The holder of the operating authority had the right to transport goods over only the particular route specified in that authority.

A motor carrier that wanted an operating authority could obtain one by applying to the State. However, a motor carrier already holding an operating authority had the right to intervene and oppose another motor carrier's application for a new operating authority. This right was used to significantly limit competition within the industry, which provided economic benefit to the motor carriers holding operating authorities.

Instead of applying to the State for a new operating authority, a motor carrier could purchase an operating authority from the motor carrier to whom it had been issued. Petitioner paid $520,677 to purchase operating authorities from other motor carriers for various specific routes.

In November 1994, the State of Washington passed temporary emergency rules to effectuate the requirements of the FAAAA, later adopting permanent rules. Similarly, the State of Oregon adopted the amendment as a temporary rule before the effective date of the FAAAA, and later passed permanent rules to effectuate the requirements of the FAAAA.

The Washington State Utilities and Transportation Commission (Washington UTC) allowed motor carriers holding a valid operating authority on December 31, 1994, to continue to operate after that date by providing that the pre-1995 authority would be recognized as an interim permit for the conduct of operations on and after January 1, 1995, until the new permit documentation was received or until July 15, 1995, whichever came first. Later, during 1995, the State issued petitioner a new permit to replace the interim permit.

Similarly, the Public Utility Commission of Oregon (Oregon PUC) provided that any motor carrier holding a valid pre-1995 operating authority was to be issued automatically a new "1A permit", which, regardless of when issued, was effective as of January 1, 1995. The holder of a 1A permit was allowed to operate anywhere within the State. Petitioner was issued a 1A permit during 1995.

The value of a pre-1995 operating authority derived from the right granted to the holders to conduct business within the

issuing State and the ability of the holder to limit competition by exercising its right to intervene in the application process. The FAAAA eliminated the holders' right to intervene and oppose applications for new operating authorities.

The parties agree that one effect of the FAAAA was to render worthless petitioner's pre-1995 operating authorities, which resulted in petitioner's sustaining an ordinary loss of $520,677.

Discussion

The only issue in this case is whether petitioner sustained the loss from the worthlessness of its pre-1995 intrastate operating authorities during 1994 or during 1995. Petitioner asserts that the operating authorities became worthless during 1994. Respondent determined that petitioner sustained the loss during 1995.

Section 165(a) allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Substance and not mere form shall govern in determining a deductible loss. See Cottage Sav. Association v. Commissioner, 499 U.S. 554, 567-568 (1991); Boehm v. Commissioner, 326 U.S. 287, 292 (1945); sec. 1.165-1(b), (d)(1), Income Tax Regs.

The question of whether the operating authorities became worthless during a given taxable year is a question of fact.  See Boehm v. Commissioner, supra at 293.  The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test.  See Lucas v. American Code Co., 280 U.S. 445, 449 (1930).  In Echols v. Commissioner, 950 F.2d 209, 213 (5th Cir. 1991), the Court of Appeals for the Fifth Circuit stated:

> the test for worthlessness is a combination of subjective and objective indicia:  a subjective determination by the taxpayer of the fact and the year of worthlessness to him, and the existence of objective factors reflecting completed transaction(s) and identifiable event(s) in the year in question--not limited, however, to transactions and events that rise to the level of divestiture of title or legal abandonment.

See also Norwest Corp. & Subs. v. Commissioner, 111 T.C. 105, 140 (1998) (citing Echols v. Commissioner, supra, and finding insufficient objective evidence of worthlessness of the property at issue); Middleton v. Commissioner, 77 T.C. 310, 322 (1981) (there is no requirement that a taxpayer relinquish title in order to establish a loss if such loss is reasonably certain in fact and ascertainable in amount), affd. per curiam 693 F.2d 124 (11th Cir. 1982).

Respondent argues that petitioner did not make a subjective determination that its operating authorities had become worthless during 1994, that no objective factors reflect completed

transactions and identifiable events that establish worthlessness in 1994, and that petitioner did not sustain the loss until its interim permits were replaced by new general permits during 1995. We disagree.

In A.J. Indus., Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974), the court concluded that "the subjective judgment of the taxpayer * * * as to whether the business assets [of the taxpayer] will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer."

On August 23, 1994, Congress enacted the FAAAA. The House conference report that accompanied the legislation indicates that Federal preemption of State authority to regulate the price, route, or service for intrastate transportation would destroy the value of the pre-1995 operating authorities. See H. Conf. Rept. 103-677 at 216 (1994) ("The conferees recognize that * * * [preemption] will eliminate the asset value of the operating authority of those affected motor carriers."). We have no doubt that when Congress enacted the FAAAA in August 1994 the value of petitioner's operating authorities plummeted.

Petitioner reported to third parties that the operating authorities were worthless during 1994. The balance sheet of petitioner's financial statements compiled as of July 31, 1994,

show a value of $0 for the operating authorities.[2]  In addition,

petitioner's quarterly report to the Interstate Commerce

Commission for the third quarter of 1994 shows the value of

petitioner's total intangible property was $520,677 at the

beginning of 1994, and $0 at the close of the quarter.[3]

The question whether the pre-1995 authorities became

entirely worthless some time before or exactly at the moment the

year 1994 expired serves no purpose.  As the legal life of the

operating authorities and the year 1994 each approached their

coterminous final moments, any value remaining with the operating

authorities after enactment of the FAAAA would have rapidly

approached zero.  Thus, the residual value of the pre-1995

authorities during the last seconds of 1994 could have been no

more than de minimis.  Accordingly, we find that petitioner's

subjective judgment of the value of its pre-1995 operating

authorities was reasonable and well founded.

Furthermore, we find that fixed and identifiable events

causing the worthlessness of the operating authorities occurred

---

[2]The financial reports also show that for the same period
during the previous year, the value of the intrastate operating
authorities was $520,677.  The balance sheet of petitioner's
financial statements compiled as of January 31, 1995, also shows
a value of $0 for the operating authorities.

[3]Petitioner's annual report to the Interstate Commerce
Commission for the year ended Dec. 31, 1994, also shows the value
of petitioner's total intangible property was $0 at the close of
the year.

during 1994. The effective date of the FAAAA was January 1, 1995. Thus, the right of the holders of the pre-1995 operating authorities to intervene in the application process and to limit the competition on their routes terminated on December 31, 1994, which makes 1994 the year the loss was sustained. See Corra Resources, Ltd. v. Commissioner, 945 F.2d 224 (7th Cir. 1991) (loss realized in the year in which mineral lease expired), affg. T.C. Memo. 1990-133; George Freitas Dairy, Inc. v. United States, 582 F.2d 500 (9th Cir. 1978) (milk processors' acceptance of producers' cancellation of milk production contract was the identifiable event).

Finally, we do not agree with respondent's argument on brief that the loss was sustained in 1995 because "petitioner relied on its operating authorities in order to receive replacement permits to which it would not have been entitled if it did not possess operating authorities in good standing as of December 31, 1994."

At most, the pre-1995 operating authorities saved petitioner the cost of applying for new general permits. Although the State of Washington provided that there was no fee for an application to convert a pre-1995 operating authority to a new general permit, and Oregon automatically issued petitioner a new 1A permit, the fee charged a motor carrier that was not converting a pre-1995 authority to apply for a permit to operate in either State was minimal. See Wash. Admin. Code sec. 480-14-140 (1995)

($275 application fee for common carrier of general commodities);
Or. Rev. Stat. sec. 825.180 (1995) ($300 application fee for for-
hire carrier in intrastate commerce). We do not find that the
value of the pre-1995 operating authority as a substitute for a
new general permit was material.

Nor do we agree with respondent's argument that petitioner
did not sustain the loss in 1994 as petitioner "relied on its
operating authorities (recognized as interim permits) to conduct
business on and after January 1, 1995 [sic] and until it received
replacement permits."

In 1995, the pre-1995 operating authorities were held as
interim permits, which were substitutes for the new general
permits while the holders waited for the States to issue the new
permits. Thus, an interim permit was merely evidence that the
holder could operate legally in the State until the new permits
were issued.

Furthermore, the FAAAA terminated State economic regulation
of intrastate transportation; therefore, States could not provide
that holders of the pre-1995 operating authorities would continue
to have the valuable right to intervene in the application
process after December 31, 1994. Thus, an interim permit did not
represent an extension of a pre-1995 operating authority; it was
no more than a substitute for a new general permit, the cost of
which was minimal.

In determining that petitioner sustained the loss in 1995, respondent seems to have adopted the position that petitioner sustained a loss from the worthlessness of operating authorities in a year in which those operating authorities did not exist.  We do not find respondent's position reasonable.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.