131 T.C. No. 17


UNITED STATES TAX COURT


IRA NATHEL AND TRACY NATHEL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

SHELDON NATHEL AND ANN M. NATHEL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 17203-06, 17204-06.    Filed December 17, 2008.


In calculating ordinary income relating to
$1,622,050 in loan payments received from two S
corporations, for purposes of sec. 1366(a)(1), I.R.C.,
petitioners treated $1,437,248 in capital contributions
they made to the S corporations as income to the S
corporations and as restoring or increasing under sec.
1367(b)(2)(B), I.R.C., their tax bases in loans
petitioners previously had made to the S corporations.
Petitioners then used the restored or increased tax
bases in the loans they made to the S corporations to
offset ordinary income that otherwise would have been
reportable by petitioners on their receipt from the S
corporations of the $1,622,050 loan payments.  On
audit, respondent determined that petitioners'
$1,437,248 capital contributions were not to be treated
as restoring or increasing petitioners' tax bases in
their loans to the S corporations but as increasing

petitioners' tax bases in their stock in the S corporations, resulting in additional ordinary income being charged to petitioners on receipt of the S corporation loan payments.

Held, among other things: For purposes of sec. 1366(a)(1), I.R.C., petitioners' $1,437,248 capital contributions to the S corporations do not constitute income to the S corporations and under sec. 1367(b)(2)(B), I.R.C., petitioners' capital contributions do not restore or increase petitioners' tax bases in their loans to the S corporations.

Hugh Janow, for petitioners.

Donald A. Glasel, for respondent.

OPINION

SWIFT, Judge: Respondent determined deficiencies in the respective amounts of $279,847 and $279,722 in petitioners Ira and Tracy Nathel's and in petitioners Sheldon and Ann M. Nathel's 2001 joint Federal income taxes. These cases have been consolidated for purposes of briefing and opinion.

In calculating petitioners' ordinary income on receipt of $1,622,050 in loan payments that petitioners received from two S corporations, the underlying issues for decision are whether for purposes of section 1366(a)(1) petitioners' $1,437,248 in capital contributions to the S corporations may be treated by petitioners as income to the S corporations and therefore as restoring or increasing petitioners' tax bases in the loans they made to the S corporations or, alternatively if the answer to the above issue

is in the negative, whether capital contributions of $1,074,456 petitioners made to one of the S corporations may be treated by petitioners as deductible ordinary losses under section 165(c)(1) or (2).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2001, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The facts of these cases were submitted fully stipulated, and these cases are submitted under Rule 122.

At the time the petitions were filed, petitioners resided in New York.

Petitioners Ira and Sheldon Nathel (petitioners[1]) are brothers. Before 1999 petitioners and an individual named Gary Wishnatzki (Gary) organized three S corporations to operate food distribution businesses in New York, California, and Florida. The corporations were named G&D Farms, Inc. (G&D), Wishnatzki & Nathel, Inc. (W&N), and Wishnatzki & Nathel of California, Inc. (W&N CAL).

Petitioners and Gary made capital contributions to each of the S corporations, and each petitioner owned 25 percent and Gary

_____

[1] Petitioners Tracy and Ann Nathel are named petitioners solely because they filed joint Federal income tax returns with their husbands. References to petitioners are to Ira and Sheldon Nathel.

owned 50 percent of the shares of stock in each of the S corporations. In addition, petitioners each made loans to G&D and to W&N CAL on open account.[2]

During 1999, 2000, and 2001 petitioners were employed as officers of W&N and petitioners received from W&N substantial compensation. Petitioners were not employed by either G&D or by W&N CAL, and petitioners received no salary or wages from G&D or W&N CAL.

Petitioners were not in the trade or business of providing guaranties on loans.

In June 1999 G&D borrowed approximately $2.5 million from two banks (bank loans). As collateral on the bank loans, petitioners and Gary each personally guaranteed the bank loans. Petitioners did not receive any compensation for guaranteeing the bank loans.

As a result of losses realized by G&D and W&N CAL in years prior to 2001 (which losses under section 1367(a)(2) reduced petitioners' tax bases in their stock in and in their loans to G&D and W&N CAL), as of January 1, 2001, petitioners' tax bases in their stock in and in their loans to G&D and W&N CAL were as follows:[3]

---

[2] The record does not reflect whether petitioners made loans to W&N.

[3] No issue is raised herein as to petitioners' tax bases in their stock in W&N.

|  | Jan. 1, 2001, Tax Bases | | | |
|  | In Stock In | | In Loans To | |
| Petitioner | G&D | W&N CAL | G&D | W&N CAL |
| Ira Nathel | $0 | $0 | $112,547 | $3,603 |
| Sheldon Nathel | 0 | 0 | 112,547 | 3,603 |

On February 2, 2001, G&D made payments to each petitioner of $649,775 on the loans petitioners made to G&D.

In the spring and summer of 2001 disagreements arose between petitioners and Gary relating to the business plans for G&D, W&N, and W&N CAL, and petitioners and Gary decided to terminate their business association through a reorganization of G&D, W&N, and W&N CAL.

In implementing the reorganization, on August 30, 2001, petitioners and Gary entered into a number of essentially simultaneous transactions which resulted in Gary owning 100 percent of G&D, in petitioners owning 100 percent of W&N (each petitioner owning 50 percent), and in the liquidation of W&N CAL.

As part of the reorganization, on August 30, 2001, petitioners and Gary each made significant additional capital contributions to G&D and W&N CAL for the reasons and as described below.

In connection with the release of petitioners' guaranties on the bank loans, with Gary's assumption of the guaranties on the bank loans, and with Gary's agreement to the general plan of

reorganization of G&D, W&N, and W&N CAL, each petitioner made additional capital contributions to G&D of $537,228.

In order to provide funds to W&N CAL so that W&N CAL could repay outstanding third-party loans of $725,586, each petitioner also made additional capital contributions to W&N CAL of $181,396 and Gary made additional capital contributions to W&N CAL of $362,794.

Following petitioners' and Gary's additional capital contributions, petitioners' stock in G&D and Gary's stock in W&N were redeemed without petitioners' and Gary's receiving any payment therefor, petitioners' guaranties were released, and Gary was left as sole guarantor on the G&D bank loans.

Further, on August 30, 2001, W&N CAL made payments to each petitioner of $161,250 on the loans petitioners made to W&N CAL.[4]  W&N CAL was then liquidated, and petitioners received nothing in the liquidation.

In summary, after the reorganization of G&D, W&N, and W&N CAL, Gary owned 100 percent of G&D, petitioners each owned 50 percent of W&N, petitioners' guaranties on the bank loans were released, Gary was left as the sole guarantor on the bank loans, and W&N CAL was liquidated.

---

[4]  The loan payments each petitioner received in 2001 of $649,775 from G&D and $161,250 from W&N CAL equal total loan payments to both petitioners of $1,622,050.

In the books and records of G&D and W&N CAL, petitioners' total August 30, 2001, capital contributions of $1,437,248 to G&D and to W&N CAL were reflected as contributions to the capital of G&D and W&N CAL.

In calculating petitioners' ordinary gain realized on receipt from G&D and from W&N CAL of the $1,622,050 loan payments, petitioners' August 30, 2001, capital contributions to G&D and to W&N CAL were treated by petitioners as constituting income under section 1366(a)(1) to G&D and W&N CAL (albeit as excludable income under section 118) and therefore as restoring or increasing under section 1367(b)(2)(B) petitioners' respective tax bases in the outstanding loans each petitioner made to G&D and W&N CAL as follows:

|  | Each Petitioner's Tax Bases in Loans To G&D and W&N CAL Increased | |
| Loans To | From | To |
| G&D | $112,546 | $649,775 |
| W&N CAL | 3,603 | 184,999 |

On petitioners' respective 2001 individual Federal income tax returns, petitioners used the above increased tax bases in their loans to G&D and W&N CAL to offset all ordinary[5] income that otherwise would have been reportable upon their receipt in 2001 of the $1,622,050 loan payments from G&D and W&N CAL.

---

[5] Petitioners do not dispute that income petitioners received in 2001 in connection with the $1,622,050 loan payments from G&D and W&N CAL is ordinary income.

On audit respondent determined that petitioners' August 30, 2001, $1,437,248 capital contributions to G&D and W&N CAL should be treated simply as capital contributions by petitioners to G&D and W&N CAL and as increasing petitioners' tax bases in their stock in G&D and W&N CAL and not as restoring or increasing under sections 1366(a)(1) and 1367(b)(2)(B) petitioners' tax bases in the loans petitioners made to G&D and W&N CAL.  Accordingly, respondent adjusted or reduced petitioners' tax bases in the loans petitioners had made to G&D and W&N CAL as set forth below:

|  | Each Petitioner's |
| Loans To | Tax Bases Reduced To |
| G&D | $112,546 |
| W&N CAL | 3,603 |

On the basis of respondent's reductions in petitioners' tax bases in the loans to G&D and W&N CAL, respondent determined that each petitioner was chargeable with $694,875 in ordinary income relating to the $1,622,050 loan payments petitioners received in 2001 from G&D and W&N CAL.[6]

Respondent's above determinations resulted in the deficiencies determined against petitioners for 2001.

---

[6] Because respondent determined that petitioners' Aug. 30, 2001, $1,437,248 capital contributions to G&D and W&N CAL increased petitioners' tax bases in their stock in G&D and W&N CAL, respondent also determined that each petitioner realized a $718,624 long-term capital loss on the Aug. 30, 2001, redemption and liquidation of their stock in G&D and W&N CAL.

## Discussion

Generally, a shareholder in an S corporation has a tax basis in his stock equal to the amount of the contributions he makes to the capital of the S corporation, and the shareholder's capital contributions are not included in the income of the S corporation. Secs. 118, 1016(a)(1), 1371(a); Commissioner v. Fink, 483 U.S. 89, 94 (1987); Edwards v. Cuba R.R. Co., 268 U.S. 628, 633 (1925); Ellinger v. United States, 470 F.3d 1325, 1329 (11th Cir. 2006); Maloof v. Commissioner, 456 F.3d 645, 648 (6th Cir. 2006), affg. T.C. Memo. 2005-75; Sleiman v. Commissioner, 187 F.3d 1352, 1356 (11th Cir. 1999), affg. T.C. Memo. 1997-530; sec. 1.118-1, Income Tax Regs.

A shareholder in an S corporation also has a tax basis in loans the shareholder makes to the S corporation equal to the amount of the loans. Secs. 1012, 1366(d)(1)(B).

Generally, under section 1367 a shareholder's tax bases in the stock in, and in the loans to, an S corporation are adjusted to reflect the shareholder's share of income, losses, deductions, and credits of the S corporation as calculated under section 1366(a)(1).

More specifically, under section 1367(a)(1) a shareholder's tax basis in stock in an S corporation is increased by, among other things, the shareholder's share of the S corporation's

income items (including "tax-exempt income"[7]), and under section 1367(a)(2) a shareholder's tax basis in his stock in an S corporation is decreased (but not below zero) by, among other things, the shareholder's share of losses and deductions.

If a shareholder's tax basis in his stock in an S corporation is reduced to zero by his share of the losses of the S corporation, any further share of the S corporation's losses decreases, but not below zero, the shareholder's tax basis in outstanding loans the shareholder has made to the S corporation. Sec. 1367(b)(2)(A); sec. 1.1367-2(b)(1), Income Tax Regs. Thus, a shareholder's tax basis in loans the shareholder has made to an S corporation may be lower than their face amount or zero because of downward adjustments in such basis caused by losses of the S corporation that are passed through to the shareholder. Sec. 1367(b)(2)(A).

Any "net increase"[8] in a year in a shareholder's share of an S corporation's income is applied first to restore or increase the shareholder's tax basis in loans the shareholder made to the S corporation (to the extent such loan basis was reduced in prior

---

[7]  Sec. 1.1366-1(a)(2)(viii), Income Tax Regs., defines "tax-exempt income" for purposes of sec. 1366(a)(1) as income which is permanently excluded from gross income. This regulation was effective Aug. 18, 1998. T.D. 8852, 2000-1 C.B. 253.

[8]  "[N]et increase" is defined as the amount by which the shareholder's pro rata share of the items described in sec. 1367 (a)(1) (relating to income items) exceed the items described in sec. 1367(a)(2) (relating to losses and deductions) for the taxable year. Sec. 1.1367-2(c)(1), Income Tax Regs.

years) and is then applied to increase the shareholder's tax basis in his stock in the S corporation. Sec. 1367(b)(2)(B); sec. 1.1367-2(c)(1), Income Tax Regs.

The above section 1367(b)(2)(B) shareholder tax basis adjustments affect the amount of gain or loss realized by a shareholder on a subsequent sale, redemption, or liquidation of the shareholder's stock in the S corporation, as well as the amount of ordinary income realized by the shareholder on the S corporation's payments on loans to the shareholder. See secs. 302(b)(3), 1001(a), 1221; Cornelius v. Commissioner, 58 T.C. 417, 422 (1972), affd. 494 F.2d 465 (5th Cir. 1974).

Petitioners acknowledge that their August 30, 2001, $1,437,248 capital contributions were made by them to G&D and W&N CAL as capital contributions and that as such the capital contributions generally would be included in the tax bases of their stock in G&D and W&N CAL and would not be included in the income of G&D or W&N CAL.

Petitioners have not cited nor have we found any cases where a shareholder's capital contributions to an S corporation are treated as income to the S corporation.

In support of the treatment, however, of their August 30, 2001, $1,437,248 capital contributions as "income" to G&D and W&N CAL, petitioners argue that because section 118 excludes capital contributions from the gross income of an S corporation in all circumstances, capital contributions to an S corporation are

"permanently excludible" from the gross income of the S corporation and are thus "tax-exempt income" under section 1.1366-1(a)(2)(viii), Income Tax Regs., and that "tax-exempt income" is to be included as an item of income to the S corporation for purposes of section 1366(a)(1) and the resulting section 1367 tax basis adjustments.

In support of their argument petitioners rely on Gitlitz v. Commissioner, 531 U.S. 206, 216 (2001), in which the Supreme Court held that income received by an insolvent S corporation from discharge of indebtedness, excluded from gross income under section 108(a), is to be treated as an item of income to the corporation for purposes of section 1366(a)(1). Petitioners argue that the Gitlitz holding should apply not only to discharge of indebtedness income, excludable from corporate income under section 108(a), but also to other items of income which are specifically excluded from gross income of an S corporation under sections 101 through 136, such as section 118.

Petitioners rely on the following language from the Supreme Court's opinion in Gitlitz:

> Section 108(a) * * * does not say that discharge of indebtedness ceases to be an item of income when the S corporation is insolvent. Instead * * * [section 108(a)] provides only that discharge of indebtedness ceases to be included in gross income. * * * Moreover, §§ 101 through 136 employ the same construction [as section 108] to exclude various items from gross income: "Gross income does not include...." * * *

* * * If discharge of indebtedness of insolvent entities were not actually "income," there would be no need to provide an exception to its inclusion in gross income. * * *  [Id. at 213-214.]

By attempting to treat petitioners' capital contributions to G&D and W&N CAL as income to G&D and W&N CAL, petitioners in effect seek to undermine three cardinal and longstanding principles of the tax law:  First, that a shareholder's contributions to the capital of a corporation increase the basis of the shareholder's stock in the corporation; see Commissioner v. Fink, supra at 94; sec. 1.118-1, Income Tax Regs.; second, that equity (i.e., a shareholder's contribution to the capital of a corporation) and debt (i.e., a shareholder's loan to the corporation) are distinguishable and are treated differently by both the Code and the courts; see Estate of Mixon v. United States, 464 F.2d 394 (5th Cir. 1972); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); compare sec. 163(a) with sec. 301(c); and third, that contributions to the capital of a corporation do not constitute income to the corporation; sec. 118; Commissioner v. Fink, supra at 94; Edwards v. Cuba R.R. Co., supra at 633 (holding that a contribution to a corporation's capital is not income to the corporation under the Sixteenth Amendment); Ellinger v. United States, supra at 1329; Sleiman v. Commissioner, supra at 1356; sec. 1.118-1, Income Tax Regs.

We do not believe that the Gitlitz holding or the provisions of subchapter S, namely sections 1366(a)(1), 1367(a)(1)(A), and

1367(b)(2)(B), should be interpreted to override these three longstanding principles of tax law.

The Gitlitz holding as to the treatment of discharge of indebtedness income as income to the S corporation under section 1366(a)(1) is distinguishable from the treatment of capital contributions made by a shareholder of an S corporation under section 118. In particular, under section 61(a)(12) discharge of indebtedness income is specifically included in the definition of "gross income". Unlike income from discharge of indebtedness, contributions to the capital of an S corporation are not listed in section 61 as an item of gross income.

Further, the regulations under section 118 specifically provide that capital contributions do not constitute income to an S corporation. In relevant part, section 1.118-1, Income Tax Regs., provides that "if a corporation requires additional funds for conducting its business and obtains such funds through * * * payments by its shareholders * * * such amounts do not constitute income".

Also, in Black's Law Dictionary 209 (6th ed. 1990), "capital contribution" is defined as:

> Various means by which a shareholder makes additional funds available to the corporation (i.e., placed at the risk of the business) without the receipt of additional stock. Such contributions are added to the basis of the shareholder's existing stock investment and do not generate income to the corporation. * * *

On the basis of the above, petitioners' capital contributions to G&D and W&N CAL are distinguishable from the discharge of indebtedness income that was at issue in Gitlitz.

We conclude that the Gitlitz holding that an S corporation's discharge of indebtedness income is to be treated as income to the S corporation for purposes of section 1366(a)(1) does not require that shareholder capital contributions to an S corporation are to be treated as income to the S corporation under section 1366(a)(1).

Petitioners also rely on Am. Med. Association v. United States, 887 F.2d 760, 774-775 (7th Cir. 1989), in which the U.S. Court of Appeals for the Seventh Circuit held that a portion of annual membership fees placed in a nonprofit organization's equity or capital account was to be treated as current income, not as noncurrent income or capital contributions to the organization. See also Wash. Athletic Club v. United States, 614 F.2d 670, 675 (9th Cir. 1980).

Both Am. Med. Association and Wash. Athletic Club are distinguishable.  The funds placed in equity accounts in those cases were not paid to the nonprofit organizations as capital contributions, and they represented payments by the members for current year memberships, not to fund deferred capital expenditures of the organizations.

Petitioners also emphasize that section 1371(a) provides that "Except as otherwise provided in * * * [subchapter S] and except

to the extent inconsistent with * * * [subchapter S]," the provisions of subchapter C are to apply to an S corporation, and petitioners argue that because section 1366(a)(1) of subchapter S provides a special rule for passing through to the shareholders items of income of the S corporation, the subchapter C general rules relating to the calculation of tax basis and to capital contributions should not apply to shareholders of S corporations. We disagree.

Before petitioners can calculate their tax bases in their loans under sections 1366(a)(1) and 1367(b)(2)(B), the gross income of both G&D and W&N CAL must be calculated. Sec. 1366(a)(1)(A). In making that gross income calculation the provisions of section 61 (regarding gross income) and the provisions of sections 101 through 136 (regarding specific exclusions from gross income such as the exclusion under section 118 of capital contributions to a corporation) apply. Sec. 1363(b). Once the gross income of G&D and of W&N CAL are calculated, section 1366(a)(1) and section 1367(b)(2)(B) apply in the calculation of petitioners' share of G&D and of W&N CAL's income and in the calculation of petitioners' tax bases in their stock in and in their loans to G&D and W&N CAL.

Thus, the provisions of section 118 apply in the calculation of an S corporation's gross income under section 1363(b) before the calculation of a shareholder's share of the income and losses of an S corporation under section 1366(a)(1) and before

adjustments to a shareholder's tax basis under section 1367(b)(2)(B), and the provisions of section 118 are not inconsistent with the provisions of subchapter S.

We conclude that shareholder capital contributions are not to be treated as items of income to an S corporation under section 1366(a)(1) and are not to be treated as items of income used in calculating a "net increase" under section 1367(b)(2)(B) for the purpose of restoring or increasing a shareholder's tax basis in loans a shareholder made to an S corporation.

Petitioners' $1,437,248 capital contributions to G&D and W&N CAL do not constitute "tax-exempt income" to G&D and W&N CAL under section 1366(a)(1) or section 1.1366-1(a)(2)(viii), Income Tax Regs., and do not restore or increase petitioners' tax bases in their loans to G&D and to W&N CAL under section 1367(b)(2)(B).

In the alternative, petitioners contend that petitioners' August 30, 2001, $1,074,456 capital contributions to G&D were made exclusively to obtain a release of petitioners' personal guaranties on G&D's bank loans and that the capital contributions to G&D should be deductible as ordinary losses under section 165(c)(1) or (2).[9]

Section 165(c)(1) provides that a taxpayer may deduct losses incurred in a trade or business, and section 165(c)(2) provides

[9] Petitioners' alternative loss argument relates only to petitioners' $1,074,456 Aug. 30, 2001, capital contributions to G&D.

that a taxpayer may deduct losses that were incurred in a transaction entered into for profit.

Petitioners stipulated that they were not in the trade or business of providing loan guarantees, that they did not receive any compensation for guaranteeing the bank loans, and that they received no salary or wages from G&D. There is no credible evidence that petitioners guaranteed the bank loans for the purpose of making a profit therefrom. On the facts before us, we can only conclude, as we do, that petitioners' guarantees on the bank loans arose out of and related to each petitioner's status as a shareholder in G&D.

Petitioners refer us to several old cases in which courts have held that a shareholder payment made to a corporation or a third party for the release from liability as a guarantor may be deductible as losses incurred in a transaction entered into for profit.

In Lloyd-Smith v. Commissioner, 40 B.T.A. 214, 223 (1939), affd. 116 F.2d 642 (2d Cir. 1941), the Board of Tax Appeals held that expenditures by a taxpayer in connection with readjustment of her liability as a guarantor of bonds qualified as deductible losses on a transaction entered into for profit because the taxpayer incurred the expenditures for the sole purpose of reducing her liability as guarantor.

In Stamos v. Commissioner, 22 T.C. 885, 888 (1954), we held that a taxpayer's legal fees incurred for the sole purpose of

obtaining release of a loan guaranty qualified as deductible losses on a transaction entered into for profit.

In Rushing v. Commissioner, 58 T.C. 996, 1001 (1972), we noted:

> [The Tax] Court has held that certain payments which had their genesis in * * * [a taxpayer's] status as [guarantor] were payments which resulted in losses incurred in a transaction entered into for profit, deductible under section 165(c)(2). See, for example, * * * Shea [v. Commissioner], 36 T.C. 577 (1961), affirmed per curiam 327 F.2d 1002 (C.A. 5, 1964) * * *.

In Shea v. Commissioner, 36 T.C. 577, 582-583 (1961), affd. 327 F.2d 1002 (5th Cir. 1964), the Court held that a taxpayer's payments to third parties for the sole purpose of obtaining a release from his liability on a corporate guaranty qualified as deductible losses under section 165(c)(2).

In Condit v. Commissioner, 333 F.2d 585, 586-587 (10th Cir. 1964), affg. 40 T.C. 24 (1963), the fact that a taxpayer's "purpose * * * was to be relieved from personal liability as guarantor on debts" was key to the court's holding that an assignment of the taxpayer's stock to another shareholder was to be treated as a loss incurred in a transaction entered into for profit and thus as a deductible loss under section 165(c)(2).

Petitioners' August 30, 2001, $1,074,456 capital contributions to G&D are distinguishable from the payments involved in the above cases because petitioners clearly had multiple purposes in making the capital contributions to G&D.

Petitioners stipulated that they made their August 30, 2001, $1,074,456 capital contributions to G&D in connection with the banks' release of petitioners' guaranties on the bank loans, with Gary's assumption of responsibility as guarantor on the bank loans, and with Gary's agreement to the reorganization of G&D, W&N, and W&N CAL. Thus, petitioners did not make the August 30, 2001, capital contributions to G&D for the sole purpose of being released from their guarantees on the bank loans.

In Duke v. United States, 39 AFTR 2d 77-847, 77-1 USTC par. 9178 (S.D.N.Y. 1977), the District Court held that because the taxpayer made payments in exchange both for the release of the taxpayer's guaranty of a corporation's debt and for the contemporaneous sale of the taxpayer's stock, the taxpayer did not make the payments solely in exchange for the release of the taxpayer's guaranty and the taxpayer was not allowed to deduct the payments as ordinary losses under section 165(c).

We conclude that petitioners' August 30, 2001, $1,074,456 capital contributions to G&D were not incurred in a trade or business under section 165(c)(1) and were not incurred in a transaction entered into for profit under section 165(c)(2).

Petitioners are not entitled to an ordinary loss deduction under section 165(c)(1) or (2) relating to their $1,074,456 G&D capital contributions.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.
