T.C. Memo. 2013-39

UNITED STATES TAX COURT

R BALL FOR R BALL III BY APPT, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17593-11, 17594-11,          Filed February 6, 2013.
            17595-11, 17596-11,
            17597-11, 17598-11,
            17599-11, 17600-11,
            17601-11.


Dennis Lawrence Stein, for petitioners.

Paul L. Darcy, Tara P. Volungis, and Michael S. Coravos, for respondent.

_____

[1]Cases of the following petitioners are consolidated herewith:  R Ball
Children Trust 9/9/1969, docket No. 17594-11; Ethel Ball For R Ball III Apt
2/9/1967, docket No. 17595-11; Ethel Ball For A L Ball As Appt, docket No.
17596-11; R Ball Jr. Children Trust 1/29/1970, docket No. 17597-11; R Ball Jr
F/B/O R Ball III 12/22/1976, docket No. 17598-11; R Ball For A L Ball By Appt,
docket No. 17599-11; R Ball Children Trust 1/24/1973, docket No. 17600-11; and
Russell Ball Jr Sec First 9/9/1967, docket No. 17601-11.

[*2]                    MEMORANDUM OPINION


KERRIGAN, Judge:  In these consolidated cases respondent determined the

following deficiencies and revised deficiencies[2] with respect to petitioners' Federal

income tax for tax year 2003:

| Petitioner | Deficiency | Revised deficiency |
|---|---|---|
| R Ball for R Ball III by Appt | $5,919,407 | $5,924,028 |
| R Ball Children Trust 9/9/1969 | 5,374,764 | 5,378,663 |
| Ethel Ball For R Ball III Apt 2/9/1967 | 4,438,105 | 4,441,316 |
| Ethel Ball For A L Ball As Appt | 4,439,848 | 4,441,316 |
| R Ball Jr. Children Trust 1/29/1970 | 3,402,808 | 3,251,740 |
| R Ball Jr F/B/O R Ball III 12/22/1976 | 545,775 | 337,445 |
| R Ball For A L Ball By Appt | 5,919,744 | 5,924,028 |
| R Ball For Children Trust 1/24/1973 | 1,839,276 | 1,840,593 |

---

[2]The parties stipulated that each statutory notice contained one or more errors
that resulted in an incorrect deficiency computation.  If respondent prevails,
petitioners will be liable for the revised statutory deficiencies.

**[\*3]**
  Russell Ball Jr Sec          2,207,131         2,208,729
   First 9/9/1967

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar and all percentage points to the second decimal place.

After concessions the issue remaining for our consideration is whether petitioners properly increased their adjusted bases in shares of an S corporation pursuant to sections 1366 and 1367 after the S corporation made a qualified subchapter S subsidiary election (Qsub election) pursuant to section 1361, which resulted in a deemed section 332 liquidation of a subsidiary.

Background

These consolidated cases were submitted fully stipulated under Rule 122. The stipulated facts are incorporated in our findings by this reference. Petitioners, electing small business trusts,[3] had legal residence in Pennsylvania when they filed

---

[3]Sec. 1361(e)(1)(A) defines electing small business trusts as any trust if (i) such trust does not have as a beneficiary any person other than (I) an individual, (II) an estate, (III) an organization described in para. (2), (3), (4), or (5) of sec. 170(c), or (IV) an organization described in sec. 170(c)(1) which holds a contingent interest

(continued...)

[*4] their petitions.  In June 1997 petitioners and a 10th shareholder not party to this consolidated action (10th shareholder) directly owned 100% of American Insurance Service, Inc. (AIS).  Petitioners and the 10th shareholder had an aggregate adjusted basis of $5,612,555 in their shares of AIS.

In 1999 petitioners and the 10th shareholder organized Wind River Investment Corp. (WRIC).  Petitioners and the 10th shareholder contributed 100% of their shares of AIS to WRIC in exchange for 100% of the stock in WRIC, resulting in a tax-deferred incorporation under section 351.  After the completed transaction petitioners and the 10th shareholder directly owned 100% of WRIC, and WRIC directly owned 100% of AIS.  During the 2003 taxable year ended September 4, 2003, petitioners owned 99.01% of WRIC.  Individually, petitioners owned the following percentages of WRIC:

---

[3](...continued)
in such trust and is not a potential current beneficiary; (ii) no interest in such trust was acquired by purchase; and (iii) an election under sec. 1361(e) applies to such trust.  Electing small business trusts are subject to further restrictions.  See sec. 1361(e)(1)(B), (2).  The parties do not dispute that petitioners are valid electing small business trusts.

| [*5]<br>Petitioner | WRIC<br>percent ownership |
| --- | --- |
| R Ball for R Ball III<br>  by Appt | 17.38 |
| R Ball Children Trust<br>  9/9/1969 | 15.78 |
| Ethel Ball For R Ball<br>  III Apt 2/9/1967 | 13.03 |
| Ethel Ball For A L<br>  Ball As Appt | 13.03 |
| R Ball Jr. Children<br>  Trust 1/29/1970 | 9.54 |
| R Ball Jr F/B/O R<br>  Ball III 12/22/1976 | 0.99 |
| R Ball For A L Ball<br>  By Appt | 17.38 |
| R Ball Children Trust<br>  1/24/1973 | 5.40 |
| Russell Ball Jr Sec<br>  First 9/9/1967 | 6.48 |

Effective June 4, 1999, WRIC elected to be taxed as an S corporation.[4]  From June 4, 1999, through September 4, 2003, WRIC continued to own 100% of AIS. During WRIC's taxable year ended September 4, 2003, WRIC made a Qsub

[4]Small business electing trusts like petitioners are permitted to hold shares of an S corporation.  Sec. 1361(c)(2)(A)(v); see sec. 1361(b)(1)(B).  The parties do not dispute that petitioners were valid S corporation shareholders.

**[*6]** election pursuant to section 1361(b)(3)(B) with respect to AIS, effective February 28, 2003.  After the election WRIC treated AIS as a qualified subchapter S subsidiary (Qsub).  Petitioners claimed that the Qsub election produced an item of income pursuant to section 1366(a)(1)(A) and adjusted their bases accordingly pursuant to section 1367(a)(1)(A).  Petitioners had the following adjusted bases in their WRIC stock before the Qsub election, and petitioners claimed the following adjusted bases in their WRIC stock after the Qsub election:

| [*7]<br><br>Petitioner | Adjusted basis<br>before Qsub election | Claimed adjusted<br>basis after Qsub<br>election |
|---|---|---|
| R Ball for R Ball III<br>  by Appt | $2,649,773 | $42,143,293 |
| R Ball Children Trust<br>  9/9/1969 | 2,405,834 | 38,263,589 |
| Ethel Ball For R Ball<br>  III Apt 2/9/1967 | 1,986,567 | 31,595,345 |
| Ethel Ball For A L<br>  Ball As Appt | 1,986,567 | 31,595,345 |
| R Ball Jr. Children<br>  Trust 1/29/1970 | 1,454,478 | 23,132,739 |
| R Ball Jr F/B/O R<br>Ball III 12/22/1976 | 150,936 | 2,400,567 |
| R Ball For A L Ball<br>  By Appt | 2,649,773 | 42,143,293 |
| R Ball Children Trust<br>  1/24/1973 | 823,289 | 13,094,003 |
| Russell Ball Jr Sec<br>  First  9/9/1967 | 987,947 | 15,712,804 |

On September 5, 2003, petitioners and the 10th shareholder sold all of their WRIC shares to an unaffiliated third party. Collectively, petitioners and the 10th shareholder received $230,111,857. Less transaction costs, petitioners received individually the following amounts from the sale of WRIC:

| [*8] Petitioner | Amount received |
| --- | --- |
| R Ball for R Ball III by Appt | $39,993,441 |
| R Ball Children Trust 9/9/1969 | 36,311,651 |
| Ethel Ball For R Ball III Apt 2/9/1967 | 29,983,575 |
| Ethel Ball For A L Ball As Appt | 29,983,575 |
| R Ball Jr. Children Trust 1/29/1970 | 21,952,671 |
| R Ball Jr F/B/O R Ball III 12/22/1976 | 2,278,107 |
| R Ball For A L Ball By Appt | 39,993,441 |
| R Ball Children Trust 1/24/1973 | 12,426,040 |
| Russell Ball Jr Sec First 9/9/1967 | 14,911,248 |

Because of this sale, WRIC ceased to be taxed as an S corporation as of September 4, 2003, and became taxable as a C corporation.

Petitioners timely filed their Forms 1041, U.S. Income Tax Return for Estates and Trusts, for tax year 2003. In their income tax returns petitioners claimed the following losses from their sale of WRIC stock:

| [*9] Petitioner | Claimed loss |
|---|---|
| R Ball for R Ball III by Appt | $2,149,852 |
| R Ball Children Trust 9/9/1969 | 1,951,938 |
| Ethel Ball For R Ball III Apt 2/9/1967 | 1,611,770 |
| Ethel Ball For A L Ball As Appt | 1,611,770 |
| R Ball Jr. Children Trust 1/29/1970 | 1,180,068 |
| R Ball Jr F/B/O R Ball III 12/22/1976 | 122,460 |
| R Ball For A L Ball By Appt | 2,149,852 |
| R Ball Children Trust 1/24/1973 | 667,963 |
| Russell Ball Jr Sec First 9/9/1967 | 801,556 |

Petitioners calculated these claimed losses using the adjusted bases in the WRIC stock that they increased after the Qsub election.

On May 18 and 19, 2011, respondent sent notices of deficiency regarding tax year 2003 to petitioners. The notices of deficiency disallowed petitioners' claimed bases adjustments in their WRIC shares following the Qsub election. Because of a computational error, the notices of deficiency failed to fully disallow

[*10] petitioners' claimed bases adjustments. For seven petitioners,[5] the notices of deficiency understated the capital gains adjustments. Respondent asserts increased deficiencies for those seven petitioners. For two petitioners,[6] the notices of deficiency provided incorrect alternative minimum tax calculations. Respondent asserts decreased deficiencies for those two petitioners.

In the notices of deficiency respondent also determined that petitioners were liable for accuracy-related penalties under section 6662(d) for tax year 2003. Respondent has waived the accuracy-related penalties for all petitioners.

## Discussion

An S corporation is defined as a small business corporation for which an election under section 1362(a) is in effect for the year. Sec. 1361(a)(1). Generally, an S corporation is not subject to Federal income tax at the entity level. Sec. 1363(a); see also Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 204 (2009), aff'd, 679 F.3d 1109 (9th Cir. 2012). Like a partnership, an S corporation is a conduit, through which income flows to its shareholders, resulting

---

[5]Petitioners R Ball for R Ball III by Appt; R Ball Children Trust 9/9/1969; Ethel Ball For R Ball III Apt 2/9/1967; Ethel Ball For A L Ball As Appt; R Ball For A L Ball By Appt; R Ball Children Trust 1/24/1973; and Russell Ball Jr Sec First 9/9/1967.

[6]Petitioners R Ball Jr. Children Trust 1/29/1970 and R Ball Jr F/B/O R Ball III 12/22/1976.

[*11] in only one level of taxation.  See Taproot Admin. Servs., Inc. v.

Commissioner, 133 T.C. at 204.

Generally, a shareholder in an S corporation begins with a tax basis in his or her stock equal to the amount of the contributions he or she makes to the capital of the S corporation; the shareholder's capital contributions are not included in the income of the S corporation.  Secs. 118, 1016(a)(1), 1371(a); Commissioner v. Fink, 483 U.S. 89, 94 (1987); Edwards v. Cuba R.R. Co., 268 U.S. 628, 633 (1925); sec. 1.118-1, Income Tax Regs.

Pursuant to section 1367(a)(1)(A), a shareholder's tax basis in the stock of an S corporation is adjusted to reflect the shareholder's pro rata share of income, losses, deductions, and credits of the S corporation, as calculated under section 1366(a)(1).  More specifically, under section 1367(a)(1)(A), a shareholder's tax basis in the stock of an S corporation is increased by the shareholder's share of the S corporation's income items (including tax-exempt income), among other things. Under section 1367(a)(2), a shareholder's tax basis in the stock of an S corporation is decreased (but not below zero) by the shareholder's pro rata share of losses and deductions, among other things, as specified in section 1367(a)(2).

**[\*12]**  Pursuant to section 1361(b)(3)(B), a parent S corporation may elect to treat a wholly owned domestic corporation[7] as a Qsub.  Once the parent S corporation has made the Qsub election, the Qsub is no longer treated as a separate corporation; rather, all assets, liabilities, items of income, deductions, and credits of the Qsub are treated as the assets, liabilities, items of income, deductions, and credits of the parent S corporation.  Sec. 1361(b)(3)(A).  The Qsub is deemed to have liquidated into the parent S corporation.  Sec. 1.1361-4(a)(2)(i), Income Tax Regs.

I.    Petitioners' Arguments and Analysis

Petitioners contend that they properly adjusted their bases in the WRIC shares after the Qsub election pursuant to section 1367(a)(1)(A) and that they properly claimed losses from the sale of WRIC on their 2003 income tax returns. Specifically, petitioners contend that the Qsub election resulted in an item of income pursuant to section 1366(a)(1)(A).

Notably, petitioners have not cited and we have not found any cases in which a Qsub election has been held to create an item of income for the parent S corporation.

---

[7]The wholly owned domestic corporation must also meet the specifications set forth in sec. 1361(b)(2).

[*13] A.    Section 61(a)(3) and Nonrecognition

Petitioners contend that the Qsub election resulted in a gain derived from dealings in property and, therefore, created an item of income under section 61(a). Section 61(a) defines gross income as "all income from whatever source derived", which includes gains derived from dealings in property. Sec. 61(a)(3). In their opening brief, petitioners claim that "the exchange of the S corporation's shares of stock in the subsidiary for the subsidiary's assets * * * [is] plainly 'gains derived from dealings in property.'"

Petitioners overlook the role of realization and recognition in determining what constitutes gain from the sale or disposition of property. Any gain from the sale or disposition of property must first be realized. See Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 559 (1991) ("Rather than assessing tax liability on the basis of annual fluctuations in the value of a taxpayer's property, the Internal Revenue Code defers the tax consequences of a gain or loss in property value until the taxpayer 'realizes' the gain or loss.").

Once a realization event has occurred, the amount of realized gain must be calculated pursuant to section 1001. Section 1001 provides, in pertinent part, the following:

[*14] SEC. 1001.  DETERMINATION OF AMOUNT OF AND
RECOGNITION OF GAIN OR LOSS.

(a) Computation of Gain or Loss.--The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) Amount Realized.--The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

(c) Recognition of Gain or Loss.--Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.

Once the amount of the realized gain has been calculated, the entire amount of the realized gain is recognized unless a Code section provides for nonrecognition treatment.  Sec. 1001(c).  Unrecognized gains "are not included in or deducted from gross income at the time the [nonrecognition] transaction occurs."  Sec. 1.61-6(b), Income Tax Regs.

Recognition is a cardinal and longstanding principle of tax law.  There are many Code sections that provide for nonrecognition treatment, including sections 351(a), 354, 361(a), 371(a)(1), 371(b)(1), 721, 1031, 1035, and 1036, among others.  Sec. 1.1002-1(c), Income Tax Regs.  These sections describe "certain

**[\*15]** specific exchanges of property in which at the time of the exchange particular differences exist between the property parted with and the property acquired, but such differences are more formal than substantial." Id. Because these differences are more formal than substantial, the Code provides that "such differences shall not be deemed controlling, and that gain or loss shall not be recognized at the time of the exchange." Id. The underlying assumption for nonrecognition treatment is that "the new property is substantially a continuation of the old investment still unliquidated". Id.

Notably, "[t]hese [nonrecognition] provisions do not forgive taxation of the realized gain; they merely defer its recognition and inclusion in gross income until the property is disposed of in a taxable transaction." Boris I. Bittker et al., Federal Income Taxation of Individuals, para. 30.01[1], at 30-3 (3d ed. 2002). Nonrecognition transactions generally preserve unrecognized gain by assigning a "substituted" or "carryover" basis to the acquired property. Id. Nonrecognition transactions "can be viewed as refinements of the pervasive concept of realization, which postpones the taxation of appreciation in the value of property (and the deduction of a decline in value) until the taxpayer sells or otherwise disposes of the property." Id.

**[\*16]** In sum, nonrecognition provisions prevent realized gain from being included in a taxpayer's gross income. When a gain derived from dealings in property is realized but not recognized, then the realized gain will not be included in gross income pursuant to section 61(a)(3) and section 1.61-6(b), Income Tax Regs.

B.    Sections 331 and 332

The making of a Qsub election is considered an adoption of a plan of liquidation immediately before the deemed liquidation, which qualifies the deemed liquidation for tax-free treatment under sections 332 and 337. Sec. 1.1361-4(a)(2)(iii), Income Tax Regs.; see sec. 1.1361-4(a)(2)(iv), Income Tax Regs.; cf. Dover Corp. & Subs. v. Commissioner, 122 T.C. 324, 333 (2004) (like the making of a Qsub election, "[t]he making of a disregarded entity election 'is considered to be the adoption of a plan of liquidation immediately before the deemed liquidation', thereby qualifying the parties to the deemed liquidation for tax-free treatment under sections 332 and 337. Sec. 301.7701-3(g)(2)(ii), Proced. & Admin. Regs."). A Qsub election thus results in a section 332 liquidation.

Section 332(a) specifies that no gain or loss shall be recognized by a parent corporation on the receipt of property distributed in complete liquidation of a subsidiary corporation. Section 332(a) is clear and unambiguous. Under a plain

**[*17]** reading of the statute the phrase "no gain or loss shall be recognized" means that the parent ignores any gain or loss realized in a section 332 liquidation when property is distributed from the subsidiary. This reading is also consistent with the congressional intent behind section 332 and other nonrecognition transactions: A taxpayer is not taxed on realized gain at the time of a nonrecognition transaction. See S. Rept. No. 83-1622 at 48 (1954), 1954 U.S.C.C.A.N. 4621, 4678-4679 (contrasting a general liquidation, in which the taxpayer receiving assets is taxed upon receipt, with a section 332 liquidation, in which the taxpayer receiving assets is not taxed because no gain or loss is recognized); see also S. Rept. No. 67-275 (1921), 1939-1 C.B. (Part 2) 181, 188 (when a taxpayer receives no cash profit in a transaction, the taxpayer should not be taxed on the transaction at that time). Because a Qsub election is a deemed section 332 liquidation, the parent S corporation shall not recognize gain or loss from the Qsub election.

Petitioners contend that any gain realized from a Qsub election constitutes income under section 331, but then section 332(a) exempts the realized gain from income with nonrecognition. Section 331(a) provides: "Amounts received by a shareholder in a distribution in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock." Section 331 does not provide for the nonrecognition of any gain realized in a section 331 liquidation.

[*18] Petitioners' interpretation of sections 331 and 332 is incorrect. Sections 331 and 332 govern two different types of liquidations. Section 332, on the one hand, governs the liquidation of a subsidiary into a parent corporation when the parent corporation owns 80% or more of the vote and value of the subsidiary. Secs. 332(b)(1), 1504(a)(2). If a section 332 liquidation occurs, then the subsidiary does not recognize any gain or loss on the distribution of property to an 80% distributee, sec. 337(a); the parent corporation takes a carryover basis in the subsidiary's assets, sec. 334(b)(1); and the parent corporation succeeds to the subsidiary's tax attributes, sec. 381(a)(2). Section 331, on the other hand, governs all other liquidations, namely when the parent corporation owns less than 80% of the vote and value of the subsidiary. See sec. 331(a). Sections 334(b)(1), 337(a), and 381(a)(2) are not triggered by a section 331 liquidation.

Either a liquidation meets the section 332(b) specifications and falls within section 332, or it does not meet the section 332(b) specifications and falls within section 331. A liquidation cannot be governed by both.

Petitioners' contention that section 331 governs all liquidations but section 332(a) exempts certain liquidations from creating income is erroneous. When WRIC made the Qsub election, WRIC engaged in a deemed liquidation of AIS

**[*19]** pursuant to section 332 because WRIC held more than 80% of the vote and value of AIS.  WRIC did not first engage in a section 331 liquidation.

Accordingly, no gain was recognized when WRIC made the Qsub election, and the unrecognized gain did not create an item of income pursuant to section 61(a)(3).

    C.    Item of Income Under Section 1366(a)(1)(A)

Petitioners contend that the realized but unrecognized gain from the Qsub election created tax-exempt income--and therefore, an item of income--pursuant to section 1366(a)(1)(A).  Section 1366(a) provides the following, in pertinent part:

> SEC. 1366(a).  Determination of Shareholder's Tax Liability.--
>
>     (1) In general.--In determining the tax under this chapter of a shareholder [of an S corporation] for the shareholder's taxable year in which the taxable year of the S corporation ends * * * there shall be taken into account the shareholder's pro rata share of the corporation's --
>
>         (A) items of income (including tax-exempt income), loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder, * * *

Section 1.1366-1(a)(2)(viii), Income Tax Regs., defines tax-exempt income as "income that is permanently excludible from gross income in all circumstances in which the applicable provision of the Internal Revenue Code applies."

**[\*20]** As discussed above unrecognized gain is not an item of income or tax-exempt income under section 1366(a)(1)(A) because unrecognized gain does not rise to the level of income. Nonrecognition treatment prevents realized gain from becoming income at the time of the nonrecognition transaction. Therefore we hold that unrecognized gain does not create an item of income under section 1366(a)(1)(A).

This holding is consistent with our reasoning in <u>McLaulin v. Commissioner</u>, 115 T.C. 255 (2000), <u>aff'd</u>, 276 F.3d 1269 (11th Cir. 2001). The taxpayers in <u>McLaulin</u> owned 100% of Ridge Pallets, Inc. (Ridge). Ridge coowned Sunbelt Forest Products, Inc. (Sunbelt), with an individual until Sunbelt redeemed all of the individual's shares. Ridge then owned 100% of Sunbelt. Soon after the redemption Ridge made a pro rata distribution of its Sunbelt stock to the taxpayers in <u>McLaulin</u>. The sole issue for decision was whether Ridge recognized gain on account of that distribution. <u>Id.</u> at 259. We reasoned that if Ridge, an S corporation, did not recognize gain from the distribution, then section 1366(a) would not require the taxpayers to take their pro rata shares of gain into account. <u>Id.</u> at 259-260. Our reasoning in <u>McLaulin</u> is the same as ours in these consolidated cases: Unrecognized gain does not create an item of income under section 1366(a)(1)(A).

**[\*21]** Petitioners claim that the Qsub election created realized gain that began as an item of income under section 61(a)(3) but was exempted from gross income pursuant to the nonrecognition provision in section 332(a). Petitioners argue that this result is consistent with United States v. Farley, 202 F.3d 198 (3d Cir. 2000), and Gitlitz v. Commissioner, 531 U.S. 206 (2001), which petitioners claim are "squarely on point" and therefore control in these consolidated cases. Petitioners' reliance on Farley and Gitlitz, however, is misguided.

The facts in Farley and Gitlitz were similar. Both cases involved insolvent S corporations that received a discharge of indebtedness. Pursuant to section 61(a)(12), gross income includes income from discharge of indebtedness. Section 108(a)(1)(B) excludes discharge of indebtedness income from the gross income of an insolvent taxpayer. Because of this exclusion, these insolvent S corporations determined that the discharge of indebtedness created tax-exempt income. They passed the discharge of indebtedness income to their shareholders pursuant to section 1366(a)(1)(A), and the shareholders adjusted their bases in the S corporations accordingly pursuant to section 1367(a)(1)(A).

The Supreme Court in Gitlitz and the Court of Appeals for the Third Circuit in Farley both held that the excluded discharge of indebtedness income was tax-exempt income. They reasoned that the discharge of indebtedness began as

[*22] income under section 61(a)(12) but was excluded from the S corporations' gross income pursuant to section 108(a)(1)(B) because these S corporations were insolvent. Gitlitz v. Commissioner, 531 U.S. at 212-213; Farley, 202 F.3d at 206. In particular the Supreme Court reasoned that excluded discharge of indebtedness does not cease to be an item of income when the S corporation is insolvent; rather, the excluded discharge of indebtedness simply "ceases to be included in gross income." Gitlitz v. Commissioner, 531 U.S. at 213.

Although Farley and Gitlitz both addressed the meaning of item of income and tax-exempt income as used in section 1366(a)(1)(A), neither case is squarely on point. Gitlitz and Farley addressed payments that section 61(a) includes explicitly in gross income and that section 108(a)(1)(B) excludes from gross income. See Nathel v. Commissioner, 615 F.3d 83, 91 (2d Cir. 2010), aff'g 131 T.C. 262 (2008). In these consolidated cases the realized gain from the Qsub election was never included explicitly in gross income and was never excluded from gross income. As discussed above, nonrecognition is not an exclusion provision. Nonrecognition merely prevents realized gain from rising to the level of income. Gitlitz and Farley did not create new items of income; they held only that the nature of discharge of indebtedness as income was not changed by the exclusion of section 108(a). See id.

**[*23]** <u>Gitlitz</u> and <u>Farley</u> are also not squarely on point because unrecognized gain is conceptually different from discharge of indebtedness income. When a taxpayer receives a discharge of indebtedness, the taxpayer's economic net worth increases. The discharge of indebtedness income thus changes the taxpayer's situation substantially. When a taxpayer engages in a nonrecognition transaction, the taxpayer's economic net worth stays the same. The nonrecognition transaction changes the taxpayer's situation only formally. Additionally, unlike unrecognized gain, excluded discharge of indebtedness income may affect the tax liability of S corporation shareholders. Section 108(b)(1) specifies that the amount of discharge of indebtedness income excluded from gross income is applied to reduce the tax attributes of the taxpayer. Unrecognized gain, however, does not reduce the tax attributes of the taxpayer. Therefore unrecognized gain does not affect the tax liability of S corporation shareholders.

Because neither <u>Farley</u> nor <u>Gitlitz</u> is squarely on point, we are not bound to follow them. Even if <u>Gitlitz</u> and <u>Farley</u> were squarely on point, Congress reversed them prospectively in 2002 when it amended section 108(d)(7)(A). <u>See</u> Job Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, sec. 402, 116 Stat. at 40. Pursuant to section 108(d)(7)(A), any discharge of indebtedness income excluded from gross income by section 108(a) is no longer an item of

[*24] income under section 1366(a). Congress believed that "it was inappropriate for a shareholder of an insolvent or bankrupt S corporation to take into account excluded income from the discharge of the S corporation's indebtedness and thereby increase the shareholder's adjusted basis in the stock." H.R. Rept. No. 107-251, at 52 (2002), 2002-3 C.B. 44, 95. Moreover, Congress believed "that where, as in the case of the present statute under section 108, the plain text of a provision of the Internal Revenue Code produces an ambiguity, the provision should be read as closing, not maintaining, a loophole that would result in an inappropriate reduction of tax liability." Id. Thus, Congress not only reversed Gitlitz and Farley prospectively as they pertained to excluded discharge of indebtedness income; Congress also proscribed any application of Gitlitz and Farley that would result in an inappropriate reduction of tax liability. Petitioners' application of Gitlitz and Farley to these consolidated cases would result in such an inappropriate reduction.

This is not the first time that we have declined to extend Gitlitz. In Nathel we declined to interpret Gitlitz as overriding the cardinal and longstanding principle of tax law that capital contributions are not treated as income. Nathel v. Commissioner, 131 T.C. at 270. The taxpayers in Nathel argued that "because section 118 excludes capital contributions from the gross income of an S

[*25] corporation in all circumstances, capital contributions to an S corporation are 'permanently excludible' from the gross income of the S corporation and are thus tax-exempt income' under section 1.1366-1(a)(2)(viii), Income Tax Regs.".  Id. at 269.  The taxpayers relied heavily on Gitlitz.  They claimed that Gitlitz should apply to other items of income specifically excluded from gross income under sections 101 through 136.  Id.

We rejected the taxpayers' reasoning and distinguished Nathel from Gitlitz, noting that contributions to the capital of an S corporation are not listed in section 61 as items of gross income.   Id. at 270-271.  We held that capital contributions are not items of income under section 1366(a)(1)(A).  Id. at 270.  The Court of Appeals for the Second Circuit affirmed our decision, concluding that the taxpayers could not "rely on Gitlitz alone to overcome the long-standing treatment of capital contributions as distinct from income."  Nathel v. Commissioner, 615 F.3d at 91.

We likewise decline to interpret Gitlitz and Farley as overriding a cardinal and longstanding principle of tax law, namely that unrecognized gain is not an item of income.   We thus decline to extend the holdings in Gitlitz and Farley to nonrecognition provisions.

**[\*26]** Accordingly, unrecognized gain from a Qsub election does not constitute an item of income or tax-exempt income under section 1366(a)(1)(A). We note that any other conclusion would lead to absurd results. Our reasoning preserves single-level taxation of S corporations by preventing S corporation shareholders from creating noneconomic basis adjustments from nonrecognition transactions. Our reasoning also preserves double-level taxation for C corporations. Before 1986 the General Utilities doctrine permitted a C corporation to escape corporate-level tax on certain distributions of appreciated property to its shareholders. See Gen. Utils. & Operating Co. v. Helvering, 296 U.S. 200, 206 (1935); see also H.R. Conf. Rept. No. 99-841 (Vol. II), at II-198 (1986), 1986-3 C.B. (Vol. 4) 1, 198. Congress repealed the General Utilities doctrine in the Tax Reform Act of 1986, thus ensuring a corporate-level tax on the distribution of appreciated property. H.R. Conf. Rept. No. 99-841, supra at II-199, 1986-3 C.B. (Vol. 4) at 199. Congress noted that the General Utilities doctrine undermined the corporate income tax. H.R. Rept. No. 99-426, at 282 (1985), 1986-3 C.B. (Vol. 2) 1, 274. Congress further cemented the repeal of the General Utilities doctrine by enacting section 1374 in the Tax Reform Act of 1986, Pub L. No. 99-514, sec. 632(a), 100 Stat. at 2275. Section 1374 prevents a C corporation from avoiding corporate-level taxation on the sale of appreciated assets by converting to an S corporation.

[*27] When the S corporation sells assets that it held before the conversion, the S corporation is taxed at the entity level on the net recognized gain from the sale. Sec. 1374(a). The shareholders are also taxed on the recognized gain under section 1366(a)(1)(A).

Petitioners' position would create noneconomic basis adjustments which would reduce or eliminate tax at the shareholder level. This would not only convert the single-level taxation of S corporations into a zero-level taxation of S corporations; it would also undermine the double-level taxation of C corporations, as preserved in section 1374, and circumvent the repeal of the General Utilities doctrine. Additionally, these absurd results would open the door to a myriad of abusive transactions. Using these noneconomic basis adjustments, petitioners attempted to turn what should have been a $202 million aggregate taxable gain into a $12 million aggregate loss. Had WRIC sold any of AIS' appreciated assets at a gain after the Qsub election, petitioners would have increased their adjusted bases in WRIC a second time, thus reducing or eliminating more tax.

D.    Section 1367(a)(1)(A) Basis Adjustment

Petitioners contend that they properly increased their adjusted bases in WRIC pursuant to section 1367(a)(1)(A) because the Qsub election created an

[*28] item of income under section 1366(a)(1)(A).  Section 1367(a) provides, in

pertinent part, the following:

> SEC. 1367(a).  General Rule.--
>
> (1) Increase in basis.-- The basis of each shareholder's stock in an S corporation shall be increased for any period by the sum of the following items determined with respect to that shareholder for such period:
>
> > (A) the items of income described in subparagraph (A) of section 1366(a)(1), * * *

As discussed above, the Qsub election did not result in an item of income described

in section 1366(a)(1)(A).  Accordingly, petitioners improperly increased their

adjusted bases in the WRIC stock following the Qsub election.

II.    Conclusion

We hold that the unrecognized gain resulting from the Qsub election did not

create an item of income or tax-exempt income pursuant to section 1366(a)(1)(A).

We further hold that petitioners improperly adjusted their bases in their WRIC stock

following the Qsub election pursuant to section 1367(a)(1)(A).  In reaching

our decision we have considered all arguments made by the parties.  To the extent

not mentioned or addressed they are irrelevant or without merit.

**[\*29]** To reflect the foregoing,

<u>An appropriate decision will be</u>

<u>entered</u>.